**VITRO CORPORATION OF AMERICA,**

v.

**HALL CHEMICAL COMPANY, and James D. Hall.**

**No. 14328.**

United States Court of Appeals
Sixth Circuit.

Aug. 9, 1961.

Maurice F. Hanning, Cleveland, Ohio, and Walter H. Free, New York City, for appellant, Milton E. Newcomer, McAfee, Hanning, Newcomer & Hazlett, Cleveland, Ohio (Dana M. Raymond, Brumbaugh, Free, Graves & Donohue, New York City, of counsel), on the brief.

Blythe D. Watts, Cleveland, Ohio, H. F. Schneider, Watts, Edgerton, Pyle & Fisher, Cleveland, Ohio, on the brief.

Before MILLER, Chief Judge, SIMONS, Senior Judge, and O'SULLIVAN, Circuit Judge.

SIMONS, Senior Judge.

This appeal involves an accounting for damages arising out of a breach of a non-disclosure agreement by the appellant, Vitro Corporation of America (hereinafter referred to as Vitro), which it had entered into with the appellees, The Hall Chemical Company and James D. Hall, (hereinafter referred to as Hall). Previously, in an interlocutory appeal, we had affirmed a determination by the District Court that Vitro had breached its agreement. 6 Cir., 254 F.2d 787 (April 19, 1958). After our interlocutory decision, the District Court referred the determination of damages to a special master who made findings of fact and announced conclusions of law and recommended that Hall be awarded damages in the amount of $348,699.00, plus interest. The District Court overruled all of Vitro's exceptions and confirmed the master's findings and conclusions, granting, however, Hall's lone exception to the master's report which objected to the determination that no damages should be awarded for the portion of the year 1958 to the date of our mandate, May 14, 1958. Accordingly, an additional $18,493.03 damages were assessed against Vitro. Also various costs and expenses were taxed against Vitro.

Much of the factual background of this case is set forth in our earlier opinion. Certain facts not therein recited or later developed in the accounting proceedings have relevance to damages and must be considered. The events upon which this litigation rests began in 1953. Vitro, for several years, had been engaged in the recovery of metal salts by hydro-metallurgical processes. It owned several plants, one of which was a refining plant at Canonsburg, Pa., which had been utilized for reclamation of uranium from atomic wastes, obtained primarily pursuant to a contract with the Atomic Energy Commission. In August, 1953, Vitro learned that its contract with the AEC might not be renewed. Thus, it became necessary for Vitro to find other uses for the Canonsburg plant. Among possibilities it considered was recovery of metal salts from high temperature steel alloy scrap, notably S-816 used in jet engines which was available in some quantity in the period following the Korean War, in 1953. Vitro did not know of any commercially feasible method for the recovery of the valuable components of the scrap, principally, cobalt, nickel and chromium. Summers, its chemist, indicated that two problems made reclamation of the valuable metals impractical from a commercial standpoint. They were lack of an economical digestion method which would quickly dissolve large chunks of scrap and after dissolution is achieved, the difficulty of separating cobalt from other metals since cobalt, the most valuable element, would be contaminated by chromium.

Vitro embarked upon various laboratory experimentation to develop a commercially useful reclamation process without appreciable success. However, it learned from a high official in the Defense Department that Hall had developed a practical reclamation process. Thereupon, it made contact with James D. Hall

and negotiations were commenced concerning a contemplated purchase of the process by Vitro.

Thus, on September 17, 1953, various people from Vitro were taken through the Hall plant at Wickliffe, Ohio, for a period of approximately three hours. On that day, Hall took the Vitro representatives through the building, showed them his equipment and made certain explanations. On October 13th and 14th, Hall, his attorney and the accountant came to New York and conferred with Vitro for the purpose of making a business arrangement for Vitro's use of the Hall process. At these meetings, Vitro asked to be allowed to make an extensive study of the Hall process and to have the details of the process disclosed to it. It was suggested by Hall's lawyer that the parties enter into a non-disclosure agreement, the breach whereof is the subject matter of this litigation. An agreement was executed on October 21, 1953 which reads as follows: "So that you and representatives of your company and ours may discuss technical information which you have available as to scrap metal recovery processes, presently in commercial use by The Hall Chemical Company, confidential and secret in nature, we agree, in consideration of disclosures to us of such technical and operative information relating to scrap metal recovery processes, to keep confidential the information so imparted to us and not to make use of it until it becomes publicly known other than by an act or omission on our part."

Also, at the New York meeting in October, Hall and representatives of Vitro commenced discussion of a proposed agreement for the use by Vitro of the Hall process and thereafter "agreed in principle" on the terms of the proposed arrangement subject to Vitro's confirmation and study of several technical matters. The substance of the "agreement in principle" as indicated by the evidence, including the minutes of Vitro's executive committee meeting on October 16, 1953, is as follows: Vitro would pay $100,000.00 on execution of the agreement, a minimum payment of $50,000.00 per year for

a period of six years, with maximum payment of $1,500,000.00. While the cross complaint recited terms for patent infringement these were later withdrawn.

Following the formulation of the "agreement in principle" and the execution of the non-disclosure agreement, Vitro's chemists spent approximately one week at Hall's Wickliffe plant where Hall fully disclosed his process for the recovery of metal salts from S-816 scrap, including both the digestion step and the separation of various metals in solution from each other.

At the November 4, 1953 meeting of the Board of Directors of Vitro, both agreements were reported by George White, Vitro's Executive Vice President, who had signed the non-disclosure agreement in its behalf. The minutes of the board meeting show that White reported to the Board on the status of the negotiations with Hall for the acquisition of his patent pertaining to the recovery of cobalt, nickel, columbium, molybdenum, etc., reviewed his professional background and experience, the nature of the process for which he claimed to hold patents, and the scope of his current operations, and that Hall had originally asked $1,500,000.00 for his patent. White also reported that although it is recognized that the payments to Mr. Hall are relatively high, it is the opinion of Management that this should be a very profitable business in a field where considerable work is needed, and is beginning at a time when we have an empty plant at Canonsburg requiring work. The Management will continue their investigation into all possible details and hopes to have a complete proposal ready for presentation to the Board at its next meeting.

Thus, the status of the negotiations between Hall and Vitro, as indicated by Vitro's own records, as of November 4, 1953, was that a non-disclosure agreement had been executed pursuant to which Hall had made full disclosures to Vitro and that while no firm agreement had been consummated concerning payments to Hall for his process, the parties nonethe-

less had, after some measure of bargaining, settled upon a definite price scheme, the minimum amounts being a $100,-000.00 initial payment and $50,000.00 per annum for a period of six years. The Board minutes, however, indicate that several matters required investigation prior to Vitro's entrance into a binding commitment to Hall. Primarily, Vitro desired to make further technical studies relating to the feasibility of the Hall process, to obtain advice on patentability and to have market surveys made.

Soon after the November 4th board meeting, the situation between the parties worsened appreciably. Vitro claimed that the Hall process could not be made to work economically, in that the cost of chemicals per unit of metal was substantially higher than Hall's estimate and the percentage of recovery of the valuable metals was lower than that promised by Hall. Hall, however, contended that its estimates were accurate and based upon its own experience. Also, Vitro's marketing consultant, McKinsey & Co., advised against Vitro's embarkation upon the reclamation project as a long-run operation but qualified its conclusion by advising that the project had some merit as an interim operation, with greatly reduced fixed commitments to Hall. The market report, based on projected figures, indicated that Vitro would be able to earn a profit of 13% with inclusion of payments to Hall under the "agreement in principle" or a profit of 21.8% without payments to Hall. And finally, Vitro asserted that the patent counsel had given an adverse opinion as to the patentability of the digestion step, application for which was then pending (this patent did issue on April 30, 1955).

Early in 1954, Vitro notified Hall that it no longer wished to purchase any rights in the Hall process and soon after commenced to use, with only slight variations, the portion of the Hall process for the separation of the various metals from the digested scrap.

Thereafter, on May 6, 1954, Vitro filed its action against Hall in the District Court seeking a declaratory judgment. Hall counterclaimed, asking for an accounting under the non-disclosure contract and to enjoin Vitro from using the secret processes disclosed in confidence. A counterclaim for infringement of the digestion patent was also made but was later withdrawn by Hall. The District Court entered judgment dismissing Vitro's complaint, issued an injunction and ordered an accounting for damages. This decision was by us affirmed in the opinion referred to earlier. We there held that the scrap metal recovery process, as testified to by witnesses for Hall and as found by the District Court, includes the entire method of recovery of metals from S–816 and not the mere dissolution of massive scrap. The digestion step is an all important preliminary to the recovery of metals, which is the end purpose of the process. We also stated the proof that the Hall process solved both the critical problem of digestion and on non-contamination of cobalt is undisputed.

We observed that the recovery problem was of great interest to Vitro because of the technical problems which it presented and for which Vitro could not find adequate solutions. We concluded that the non-disclosure agreement covered not just the digestion step, covered by the patent, as claimed by Vitro, but also the portion of the process relating to the separation of metals, which were not covered by patent, disclosed by Hall. There was no indication that Vitro had used Hall's digestion step and this is borne out by the fact that Hall withdrew its patent infringement counterclaim. However, we did hold that Vitro had been using, since early in 1954, the Hall recovery process which we deemed to be a trade secret and that that use constituted a breach of the non-disclosure agreement.

The case then went back to the District Court for an accounting. It was referred to a special master who heard witnesses and took evidence. He considered five possible methods to determine damages. "Lost sales," "lost profits" and "standard of comparison" were rejected as a basis for computing damages.

The master determined that the proper method, under the facts presented, was an "established royalty" computation and that this royalty would be determined by using the minimum amounts established by the parties themselves in the "agreement in principle." Therefore, he awarded the following damages to Hall: $100,000.00, the down payment, and $50,000.00 per annum for the years 1954 and through 1957, the minima for each full year of use by Vitro of the Hall process, plus interest.

■ Vitro claimed, however, that the "agreement in principle" related only to the digestion patent which it did not use and, thus, this "agreement" should not be used to determine damages which involve only use of the recovery step. However, the master held himself foreclosed by the earlier opinions in this case by the District Court and by us from consideration of the contention renewed before him by Vitro, that its agreement with Hall related only to the digestion process of dissolving massive scrap and not the recovery of metals in the alloy. Our earlier opinion held that the agreement covered the whole process and is now the law of the case.

The master further held that substantial performance of the asserted conditions Vitro had placed upon the application of the "agreement in principle" (i. e., patentability, technical feasibility and marketability) was either established or projected by competent authority.

He further observed that in the formation of the "agreement in principle" Vitro was bargaining not only for the process but also for the collateral advantage of keeping its Canonsburg plant in use and the hope that with its aggressiveness, know-how and efficiency it could profitably develop and sell the product of its use of the Hall process. He, therefore, held that the down payment and annual minima under the agreement in principle furnished an equitable means of imposing damages. He held that a reasonable royalty method would be inequitable and denied a proffer of evidence on the issue of reasonable royalties.

The District Court overruled Vitro's objections, stating: "The Master, believing the accounting to be analogous to that in infringement cases, adopted a method which, as it seems to me, was as close an approach to a fair and just determination of adequate damages as might be relied upon."

The Court, however, increased the award to Hall, adding $18,493.03, the prorated percentage of $50,000.00, for the portion of the year 1958 up until May 14, 1958, the date of our mandate determining the interlocutory judgment and also assessed various costs against Vitro. We think this was right.

■■ Vitro vigorously urges that it was erroneous for the master to base his award on the "agreement in principle." This contention both the master and the court rejected. There is thus presented to us the following situation. The disclosure agreement was a contract breached by Vitro in its utilization of the Hall process. The "agreement in principle" is not a firm contract but in its use we apply equitable principles. By the nondisclosure agreement it is clear that Hall was protecting its process as a trade-secret. As such, Hall was entitled to the same protection as the inventor of a patent. A. O. Smith Corporation v. Petroleum Iron Works Company, 6 Cir., 73 F.2d 531. There, we had held that the discoverer of a secret suffers damages to the same extent as does the inventor of a patent which had been infringed. The late Judge Denison in Egry Register Company v. Standard Register Company, 6 Cir., 23 F.2d 438, 442, 443, had reasoned that when a plaintiff, having suffered a plain injury and not having been able to make satisfactory proof of damages, a clear instance is presented of that class of cases discussed in United States Frumentum Company v. Lauhoff, 7 Cir., 216 F. 610, 615, where the award of a reasonable royalty is the *only solution* of the difficulty. To adopt a reasonable royalty as a measure of damages is to adopt and interpret as well as may be the fiction that a license was to be granted at the time of the infringement and then to de-

termine what the license price should have been. In effect, the Court assumes the existence ab initio of and declares the equitable terms of a supposititious license and does this nunc pro tunc. It creates and applies retrospectively a compulsory license. The primary inquiry is what the parties would have agreed upon if both were reasonably trying to reach an agreement. Pecuniary loss in any event can be determined only by reasonable approximation. The actual value of what has been appropriated is always the ultimate in appraisement. If actual value can be ascertained by a reasonable apportionment of profits and damages that course should be pursued. But if this cannot be accomplished the nature of the invention, its utility and advantages and extent of use involved are elements to be considered in determining a reasonable royalty.

This concept has been recognized in the reasoning of the Supreme Court in Dowagiac Manufacturing Company v. Minnesota Plow Company, 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398 and we have noted, even while sustaining a reasonable royalty, in Enterprise Manufacturing Company v. Shakespeare Company, 7 Cir., 141 F.2d 916, 920, where we said: "If actual value can be ascertained by a reasonable apportionment of profits and damages, that course should be pursued." * * * Here, the master made findings to the effect not alone of the absence of proof of lost profits, for there were no profits, but found there was no proof of lost sales (because of lost invoices), and there were no standards of comparison. The proofs adequately support, as an equitable measure of damages, established royalties, the payments agreed upon in the "agreement in principle." This is the best evidence. It is but the utilization of what was agreed upon as compensation in the event that a firm contract would be executed. The cases hold that a reasonable royalty furnishes a basis for an award only when there are no solid conditions governing the application of an "agreement in principle."

We are of the view that the findings of the master were not erroneous and that the reasoning of the Court was not illogical or unfair; wherefore,

Its judgment is affirmed.