*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0304p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MID-MICHIGAN COMPUTER SYSTEMS, INC.,
　　　　　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

MARC GLASSMAN, INC.,
　　　　　　　　　　　　*Defendant-Appellant.*

No. 04-3058

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-03117—Kathleen McDonald O'Malley, District Judge.

Argued: February 4, 2005

Decided and Filed: July 20, 2005

Before: SILER, COLE, and CLAY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Raymond Rundelli, CALFEE, HALTER & GRISWOLD, Cleveland, Ohio, for Appellant. Michael K. Grace, GRACE & GRACE, Los Angeles, California, for Appellee. **ON BRIEF:** Raymond Rundelli, Brian D. Johnson, CALFEE, HALTER & GRISWOLD, Cleveland, Ohio, for Appellant. Michael K. Grace, GRACE & GRACE, Los Angeles, California, Darrell A. Clay, WALTER & HAVERFIELD, Cleveland, Ohio, for Appellee.

　　CLAY, J., delivered the opinion of the court, in which SILER, J., joined. COLE, J. (p. 8), delivered a separate concurring opinion.

───────────────

## OPINION

───────────────

　　CLAY, Circuit Judge. This appeal relates solely to the amount of damages the jury awarded to Plaintiff Mid-Michigan Computer Systems, Inc. ("MMCS") on its claim that Defendant Marc Glassman, Inc., ("MGI") misappropriated certain of MMCS's trade secrets in violation of Ohio law. MGI appeals the district court's denial of its motion for remittitur. Specifically, MGI contends that the jury's award of $2 million in compensatory damages and $5 million in punitive damages is clearly excessive and grossly disproportionate to the loss suffered by MMCS, as that loss is reflected in the evidence presented at trial. We are not persuaded by MGI's contention that the award is clearly excessive and we therefore cannot say the district court abused its discretion in denying the motion for remittitur. Accordingly, we affirm the judgment of the district court.

1

## I. BACKGROUND

Beginning in 1987, MMCS licensed software to MGI for use in MGI's pharmacies. The purpose of the software was to maintain prescription and billing records for MGI's customers. The software enabled MGI to search those records and bill customers' insurers with ease. In addition, as part of the agreement between the companies, MMCS sold to MGI various hardware necessary to implement its pharmacy software. However, MMCS sought to protect the software's source code from being divulged to either MGI or anyone else because it contained proprietary material owned by MMCS. To that end, in 1997 the parties entered into a Source Code Agreement, which provided that MMCS would place a copy of the source code in escrow. Under the Agreement, MGI could access the source code only in certain specified emergencies, e.g., if the management of MMCS died in a disaster or if MMCS entered bankruptcy. MGI further agreed that if it accessed the source code wrongfully, i.e., in a manner not authorized under the Agreement, it would pay MMCS damages in the amount of $50,000 for each pharmacy in which MGI was using MMCS's software.

As the year 2000 approached, MGI sought to upgrade the computer systems in its 40 pharmacies such that all of the individual systems would be part of a centralized network. MGI set its sights on a network-ready system offered by the Condor Corporation called "TechRX." But in order to implement TechRX, MGI had to convert the data stored on MMCS's system to a format compatible with TechRX. To accomplish this, MGI elicited bids to complete the conversion from, among others, MMCS and Two-Point Conversions, Inc., ("TPC"), a company owned by MGI. MMCS offered to perform the conversion for $330,000. TPC offered to do the job for $63,000. Despite MGI's offer to pay MMCS $100,000, the latter declined and MGI assigned the conversion to TPC in February or March 2000.

On December 13, 2000, counsel for MMCS sent a letter to Kevin Yaugher, then-president of MGI, accusing MGI of infringing MMCS's copyrights to its software, misappropriating trade secrets, and breaching the parties' Source Code Agreement. According to the letter, MGI secretly copied software from an MMCS computer which MGI had withheld from MMCS under false pretenses. The letter alleged that MGI used the software stored on the computer to reconstruct MMCS's source code through "reverse engineering."[1] The letter demanded $2,150,000 in damages, as provided for in the Source Code Agreement ($50,000 for each of MGI's pharmacies, which then numbered 43). The letter further warned that if the amount sought was not received by 5:00 p.m. PST on December 15, 2000, MMCS "will terminate all of its agreements with [MGI] for material breach without further notice." JA 57.

At the time of the letter, MGI had not yet completed the conversion process and thus some of its pharmacies still depended on MMCS's computer system. MGI interpreted the December 13, 2000 letter as a threat to the effect that MMCS might terminate its systems at the MGI pharmacies that still used them. Consequently, on December 15, 2000, MGI brought an action against MMCS for injunctive relief in the Northern District of Ohio. The court held a hearing on MGI's motion for a temporary restraining order, at which hearing MMCS agreed to permit MGI to continue using its computer system at the pharmacies where the system was still active.

After first asserting counterclaims against the two companies, on July 17, 2001, MMCS filed a complaint against MGI and TPC in the Northern District of Ohio. The complaint alleged, *inter alia*, that MGI had breached the Source Code Agreement and other agreements between the two companies and infringed MMCS's copyright in its source code. MMCS brought claims of misappropriation of trade secrets and unfair competition against both MGI and TPC. Jurisdiction

---

[1]This means MGI worked backward from the software stored on the computer to reconstruct its source code. *See Micro Data Base Sys., Inc., v. Dharma Sys., Inc.*, 148 F.3d 649, 652 (7th Cir. 1998) (citing cases having to do with reverse engineering).

was premised on diversity of citizenship,[2] 28 U.S.C. § 1332(a), and the copyright claim, 28 U.S.C. §1338(a).

Prior to trial, the district court dismissed various of MMCS's claims[3] and MMCS settled its remaining claims against TPC.[4] One of the claims dismissed by the court was MMCS's claim that MGI had breached the Source Code Agreement. In granting MGI's motion for judgment on the pleadings as to this claim, the court explained that "MGI could breach the Source Code Agreement only by obtaining the actual copies of the materials that MMCS placed in the safety deposit box, and not by somehow obtaining (or reverse-engineering) other copies." JA 186.

On July 8, 2003, MMCS's remaining claims against MGI – misappropriation of trade secrets, fraud, and breach of software license agreements – went to trial. The evidence presented at trial bears out the accusations MMCS's counsel made in his December 13, 2000 letter to MGI's president. At trial, former MGI employee Peter Bruno testified that MGI deliberately concealed from MMCS its intention to upgrade to the TechRX system and in the meantime transferred an MMCS computer designed for year 2000 reliability testing (the "Y2K computer"), which MMCS had loaned to MGI, to TPC. MMCS loaned MGI the Y2K computer, which MGI stored at its corporate headquarters, exclusively for year 2000 readiness purposes. To simulate anticipated effects of the year 2000 change, the computer was equipped with the MMCS pharmacy software and a set of expired data. Bruno testified that in spring 2000 – ostensibly after all Y2K readiness issues had been resolved – Joe Raso, his superior at MGI, instructed him to ship the Y2K computer to TPC. Although Raso did not tell Bruno why this was necessary, Bruno testified that he "knew the reason why," it was "for the purpose of converting the files on it to a new system that [MGI] was going towards." JA 376.

Bruno further testified that MGI was aware that it had purchased the rights to MMCS software only for use at MGI's pharmacies, that "we couldn't give it to someone else," and that "it was assumed" that the software was confidential. JA 371-2. After TPC received the computer, Raso instructed Bruno to assist TPC in booting the MMCS software. Specifically, Raso transferred a phone call from TPC's president, Phil Lisitza, to Bruno, who then supplied Lisitza with the password to the MMCS system and instructions on running the system. It was Bruno's understanding that TPC's purpose in accessing the MMCS system was to extract MMCS software information that would enable it to prepare a conversion program such that MGI customer data on the MMCS system could be transferred to TechRX. Finally, Bruno testified that when an MMCS representative arrived at MGI headquarters in search of the Y2K computer, Raso and Bruno (at Raso's direction) lied and said they "did not know where the Y2K computer was." JA 386-88.

MGI did not controvert Bruno's testimony and on appeal it concedes liability for misappropriating trade secrets. As to the extent of the misappropriation, MMCS President Lisa Lundahl's un-rebutted testimony was as follows. Lundahl recounted how she examined the source code TPC had written for its conversion program. Lundahl noticed certain features in the TPC conversion program that were either identical or significantly reminiscent of MMCS's source code. In particular, Lundahl testified that the TPC conversion program used the same format as the MMCS software for listing a customer's health conditions. Further, Lundahl testified that the TPC conversion program computed dates according to the same unique method used by the MMCS

---

[2] MGI is an Ohio Corporation, TPC, an Illinois Corporation, and MMCS, a Michigan Corporation.

[3] The court dismissed MMCS's claims of conversion, copyright infringement, and unfair competition.

[4] As part of the settlement between MMCS and TPC, TPC agreed to be enjoined from using any of the trade secrets it had participated in misappropriating.

software.  Lundahl also testified that the TPC conversion program employed the same "algorithm that [MMCS] use[s] to calculate the prescription number."  JA 589.  Lundahl explained that the only way TPC could have discovered these features of the MMCS source code is by reconstructing them from the software on the Y2K computer.  Finally, Lundahl testified that she discovered a total of 80 instances of TPC's use of MMCS source code in her review of the TPC conversion program.

During trial, the court denied MGI's motion for a judgment as a matter of law.  The jury returned a verdict in favor of MMCS on all claims.  On MMCS's trade secrets claim, the jury awarded $2 million in compensatory damages and $5 million in punitive damages.  On MGI's motion for remittitur, the district court refused to remit the combined $7 million damages award returned on the trade secrets claim but agreed to remit the $280,000 awarded for MGI's breach of certain software license agreements.  MGI appeals the denial of its motion to remit the damages awarded on the trade secrets claim.

## II.  STANDARD OF REVIEW

We review the denial of a motion for remittitur for abuse of discretion and view the facts in the light most favorable to MMCS, since it prevailed at trial.  *Gregory v. Shelby County*, 220 F.3d 433, 443 (6th Cir. 2000); *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990).  We have explained that "[a] trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court."  *Gregory*, 220 F.3d at 443 (citing *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391 (6th Cir. 1990)).

## III.  DISCUSSION

MGI seeks remittitur on the ground that the extent and type of misappropriation proven at trial cannot support a compensatory damages award of $2 million, which the jury awarded as a reasonable royalty for the right to use the misappropriated trade secrets.  MGI concedes that it misappropriated certain of MMCS's trade secrets and that the misappropriation is compensable.  Its argument is that the only trade secrets it misappropriated in a sense that is compensable under the law were not proven to be worth $2 million.  We reject this contention because there was evidence before the jury that the parties valued the misappropriated trade secrets at $2 million.

Our leading case in this area is unpublished.  In our opinion in that case, we said:

Damages in trade secrets cases are difficult to calculate, because the offending company has mixed the profits and savings from increased quality and quantity of products, as well as savings from reduced research and production, with its own natural profits. . . . When the misappropriated trade secret is used to field competing products, the best measure of damages is the plaintiff's lost profits or the defendant's illicit gains.  However, where the misappropriated secrets were not directly used to field competing products, but were used, for example, to save research and manufacturing resources, plaintiffs have used a number of different methods of calculation to determine damages.

*Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 Fed. Appx. 479, 485 (6th Cir. 2002) (unpublished).

Here, MGI did not use the trade secrets it misappropriated from MMCS to field competing products, but instead used them "to save research and manufacturing resources," *id.*, resources it would have expended to develop the software that ultimately replaced MMCS's pharmacy software.  Consequently, the reasonable royalty measure adopted by the jury is one appropriate measure of

damages. *Id*. at 487; *Univ. Computing Co. v. Lykes-Youngtown Corp*., 504 F.2d 518, 536-38 (5th Cir. 1974). Indeed, under Ohio's version of the Uniform Trade Secrets Act, "[d]amages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty that is equitable under the circumstances considering the loss to the complainant, the benefit to the misappropriator, or both, for a misappropriator's unauthorized disclosure or use of a trade secret." Ohio Rev. Code § 1333.63(A).

The district court instructed the jury in a manner consistent with these principles, to wit: "In determining which method to use to calculate [MMCS's] compensatory damages, if you determine that [MMCS's] lost profits and MGI's unjust enrichment are inadequate to fully compensate [MMCS] for the misappropriation of its trade secrets, then you should calculate compensatory damages based upon a reasonable royalty." JA 523-24. As indicated, the jury selected the reasonable royalty approach; MGI does not dispute the selection of that approach so much as it disagrees with the jury's conclusion that $2 million was a reasonable royalty.

Under long-standing case law in this circuit, "[t]o adopt a reasonable royalty as the measure of damages is to adopt and interpret, as well as may be, the fiction that a license was to be granted at the time of beginning the infringement, and then to determine what the license price should have been. In effect, the court assumes the existence ab initio of, and declares the equitable terms of, a suppositious license, and does this nunc pro tunc; it creates and applies retrospectively a compulsory license." *Egry Register Co. v. Standard Register Co.*, 23 F.2d 438, 443 (6th Cir. 1928); *see also Vitor Corp. v. Hall Chem. Co.*, 292 F.2d 678, 682-83 (6th Cir. 1961). Following this approach, "[t]he actual value of what has been appropriated is always the ultimate in appraisement." *Vitor*, *supra*, at 683. But because the precise value of a trade secret may be difficult to determine, "the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place." *Univ. Computing Co.*, 504 F.2d at 539; *see also Vermont Microsys., Inc., v. Autodesk, Inc.,* 88 F.3d 142, 151 (2d Cir. 1996) ("A reasonable royalty award attempts to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff.").

The basis for the $2 million reasonable royalty award was the parties' 1997 Source Code Agreement, in which MGI agreed to pay liquidated damages in the amount of $50,000 per pharmacy in the event it wrongfully accessed the source code stored in escrow. Since MGI operated 40 pharmacies at the time of the misappropriation, MMCS proposed a compensatory damages award of $2 million. Assuming *arguendo* that it would be held liable for misappropriation, MGI proposed a compensatory damages award of up to $330,000, the amount MMCS would have earned had MGI accepted its offer to perform the conversion. This was a strange proposal for damages on the trade secrets claim since MMCS's offer to perform the conversion was merely an offer to perform a service for MGI, not in any sense an offer to sell MGI the right to exploit features of MMCS's source code. In any event, the jury agreed with MMCS's proposal and awarded it $2 million. MGI contends the liquidated damages provision of the 1997 Source Code Agreement is not an accurate measure of "what the parties would have agreed to as a fair licensing price," *Vermont Microsys*., 88 F.3d at 151, for the specific trade secrets it misappropriated. MGI posits that the liquidated damages provision contemplates, and would have been triggered by, only a wholesale conversion of the source code, not the type of piecemeal pilfering that MGI says occurred. But whether MGI is liable for breaching the Source Code Agreement is not at issue here, because the district court dismissed that claim before trial and MMCS did not appeal the dismissal. The sole question is whether, viewing the evidence in the light most favorable to MMCS, the liquidated damages provision's formula constitutes a "clearly excessive," *Gregory*, 220 F.3d at 443, estimation of what MGI would have paid in exchange for the right to rely on the source code's protected contents to develop its software conversion program. *Vitor*, 292 F.2d at 683; *Univ. Computing Co.*, 504 F.2d

at 539; *Vermont Microsys.*, 88 F.3d at 151.  Under the deferential standard of review that controls here, *see Gregory*, 220 F.3d at 443; *Avery Dennison*, 45 Fed. Appx. at 489, we decline to hold that the $2 million figure used by the jury was a clearly excessive estimation of the price MGI would have paid for such a "suppositious license." *Egry Register Co.*, 23 F.2d at 443.

Ohio law defines misappropriation as, *inter alia*, "[d]isclosure or use of a trade secret of another without the express or implied consent of the other person by a person who . . . [u]sed improper means to acquire knowledge of the trade secret . . . ."  OHIO REV. CODE § 1333.61(B)(2)(a).  Further, "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1333.61(A).  MGI has never disputed that the MMCS source code qualifies as a collection of trade secrets nor that MMCS took careful measures to protect the source code from invasion by MGI or anyone else.  It is further clear from Bruno's testimony and MGI's own concession that misappropriation occurred here.  Moreover, the evidence presented at trial – in particular, the testimony of MMCS President Lisa Lundahl – could lead a reasonable jury to conclude that MGI used the software stored on the Y2K computer to reconstruct MMCS's protected source code.  The evidence in this regard does not necessarily compel the conclusion MGI urges, namely, that it used the reconstructed source code only in a limited sense, not to the extent necessary to support the $2 million reasonable royalty award.

Lundahl's account of the similarities between MMCS's source code and MGI's conversion program code could reasonably support the inference that MGI's exploitation of MMCS's source code was pervasive rather than selective.  Lundahl testified that MGI had directly appropriated certain of MMCS's proprietary algorithms, including algorithms controlling date computation, the listing of customers' health conditions, and the calculation and recording of prescription numbers. In addition, Lundahl testified to having discovered 80 instances of line-by-line code copying.  MGI did not attempt to rebut this evidence at trial and the jury reasonably could have concluded from hearing it that MGI had effectively misappropriated the source code in its entirety.  And this is all the jury would have had to conclude to justify a compensatory damages award of $2 million, because the parties had a pre-existing agreement that if MGI wrongfully accessed the source code, it would be liable for damages in the amount of $50,000 for every pharmacy in which it was running MMCS's pharmacy software.  It is true that this agreement, the 1997 Source Code Agreement, was not a licensing agreement; if it were, the liquidated damages provision would have the same effect as a royalty agreement and would control, to the exclusion of all other measures, the determination of the reasonable royalty award. *See Vitor*, 292 F.2d at 68-81; *Univ. Computing Co.*, 504 F.2d at 538; *Computer Assocs. Int'l v. American Fundware, Inc.*, 831 F. Supp. 1516, 1527 (D. Colo. 1993) (citing Michael A. Rosenhouse, Annotation, *Proper Measure of Damages and Elements of Damages for Misappropriation of Trade Secrets*, 11 A.L.R. 4th 12, § 2 at 20 (1982)).  It is also true that whether MGI breached the agreement is not an issue in this case.  But these two points do not detract from the agreement's value as a benchmark for estimating "what the parties would have agreed to as a fair licensing price," *Vermont Microsys.*, 88 F.3d at 151, for unrestricted use of the source code.[5]  This is especially true since the jury heard un-rebutted testimony from Lundahl that the agreement was the ideal benchmark for such an estimation.  Under these circumstances, the $2 million compensatory damages award was neither clearly excessive nor conscience-shocking, so we must conclude the district court did not abuse its discretion in declining to remit it. *See Gregory*, 220 F.3d at 443; *Avery Dennison*, 45 Fed. Appx. at 489.  Because the compensatory damages award need not be remitted, MGI's challenge to the punitive damages award of $5 million, on the ground

---

[5] MGI's suggestion that the compensatory damages award was the result of the jury's mistaken belief that MGI had breached the Source Code Agreement is without merit. The district court dismissed the breach of contract claim and instructed the jury that the evidence regarding the agreement went only to the calculation of a reasonable royalty award on the trade secrets claim.  MGI does not rebut the presumption that the district court's limiting instruction cured any potential confusion on the jury's part. *See Holmes v. City of Massillon*, 78 F.3d 1041, 1046-47 (6th Cir. 1996).

that it is excessive under Ohio law, must also be dismissed. Ohio Rev. Code § 1333.63(B) (a punitive damages award is not excessive unless it exceeds three times the amount of the compensatory damages award).

## IV. CONCLUSION

Because the district court did not abuse its discretion in denying the motion for remittitur, the judgment is affirmed.

---

**CONCURRENCE**

---

R. GUY COLE, JR., Circuit Judge, concurring. I disagree with the majority's conclusion that the jury could have reasonably concluded that MGI had effectively misappropriated the source code in its entirety. To the contrary, the undisputed evidence on both sides showed that MGI copied only portions of the code necessary to effect the conversion program. Nonetheless, we are required to view the jury's award in the light most favorable to the awardee. *Gregory v. Shelby County*, 220 F.3d 433, 443 (6th Cir. 2000). It could very well be the case that the jury believed that MGI copied the only valuable portions of the code, and that the remainder of the MMCS code effectively had little to no value. There is no way to divine if this is what the jury believed or if it is in fact the case that the copied portions were the only valuable portions of the code. However, because we may not remit a jury award "unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss," *Jackson v. City of Cookeville*, 31 F.3d 1354, 1359 (6th Cir. 1994) (citations omitted), I would conclude that the jury reasonably determined that the limited portions of the code misappropriated by MGI were the only valuable portions of the code at issue, and based their award on this conclusion. I thus concur in the result reached by the majority, affirming the award below.