Jane Bland, Justice
In this theft-of-trade-secrets case, the jury found that two former executives misappropriated trade secrets from their employer, and then used those secrets to start a competing business. The jury awarded the former employer $4 million in reasonable-royalty damages and $10,500 in lost profits. The trial court's judgment *205 awards those damages and adds permanent injunctive relief.
The competing company, TMRJ Holdings Inc., appeals. TMRJ does not challenge the damages awarded by the jury or the availability of reasonable-royalty damages in this case. Rather, TMRJ contends that the trial court erred in awarding both damages and permanent injunctive relief, arguing that the two remedies are duplicative and to award both violates the one-satisfaction rule. TMRJ further contends that the trial court's injunction is impermissibly vague, as it does not define the conduct that it prohibits. We hold that the trial court acted within its discretion in determining that injunctive relief was necessary to adequately redress the injury caused by TMRJ's misappropriation. The injunction, however, does not reasonably delineate the conduct enjoined, as required by the Texas Rules of Civil Procedure. We therefore reverse that part of the judgment and remand the case for further proceedings.
BACKGROUND
Inhance develops an in-house process for converting solid fluorine to gas.
Since 1982, Inhance Technologies, LLC, has been in the surface-fluorination business, a process that exposes plastic containers to fluorine gas. Surface-fluorination forms a barrier inside plastic containers to make them impervious to caustic substances. For example, the process produces plastic containers that are suitable for storing gasoline.
Fluorine gas is extremely volatile. Producing and using it safely in a manufacturing context presents significant challenges. For years, surface-fluorination businesses like Inhance purchased fluorine gas from outside suppliers as a raw material.
Inhance realized that it could achieve significant cost savings if it produced its own fluorine gas. But to develop its own method would be a difficult, time-consuming, and potentially dangerous undertaking. Fluorine is the most corrosive element on the periodic table and is extremely reactive. It requires careful handling to prevent explosions and can be deadly even in very low concentrations.
Through its founders, Bill Brown and Monty Ballard, Inhance invested 30 years of research and development in a process for producing fluorine gas in-house. Inhance developed a three-step system to safely create, convey, and apply fluorine gas to the products that it sold. Inhance is the only company in the United States that uses this system. Inhance has revised and refined the system several times since originally devising it.
Inhance's in-house method for developing fluorine gas significantly reduced the cost of its surface-fluorination process. As a result, Inhance became a leader in the business and undercut its competitors' pricing. Competitors became unable to compete and left the market, and eventually Inhance became the only provider of surface-fluorination services.
Two Inhance executives leave and form a competing company.
Paul Banks is a degreed mechanical engineer who worked as an engineer in the chemical industry before joining Inhance. During his 25-year tenure with Inhance, Banks worked in several executive positions, including Senior Vice President of Engineering and Vice President of Sales and Marketing. Among other duties, he participated in the design, engineering, and installation of most of Inhance's fluorination facilities and assisted in refining the three-step system.
David Molthen worked for about 20 years at Inhance in various executive capacities, *206 including Vice President of Operations and Senior Vice President of Operations and Administration. Also, as Inhance's international representative, Molthen was involved in managing Inhance's locations and affiliates throughout the world. During his tenure, Molthen assisted in repairing and installing Inhance's fluorination equipment throughout the world and, like Banks, participated in making revisions and refinements to the three-step system.
At the end of 2011, Banks and Molthen, while still employed by Inhance, began to discuss forming their own surface-fluorination company, TMRJ, to compete with Inhance. They planned to use electrochemical processes and equipment nearly identical to those used by Inhance. They made plans to hire Clayton English, an Inhance engineer, to work with them.
From 2012 to mid-2013, Banks and Molthen formulated a business plan for TMRJ and sought investors. The business plan contemplated that TMRJ would build facilities in Illinois, close to an existing Inhance plant that served some of Inhance's largest customers. Inhance fired Molthen in June 2013. Banks left Inhance later that month.
Banks and Molthen quickly completed the design of their first fluorine-gas production cell, which incorporated elements similar to those used by Inhance. TMRJ achieved in-house production of fluorine gas within a short time. By May 2015, it had built a facility in Illinois, began operations, and began to target Inhance's customers and undercut Inhance's prices to gain business. Because of Banks and Molthen's long association with Inhance and their knowledge of Inhance's proprietary processes, Inhance suspected that TMRJ was using Inhance's processes without its permission.
Inhance sues TMRJ, Banks, and Molthen.
In July 2015, after TMRJ had been operating for three months, Inhance sued TMRJ, Banks, and Molthen, alleging trade-secret misappropriation, breach of contract, and other claims, and seeking temporary and permanent injunctive relief. Inhance obtained an agreed temporary restraining order preventing TMRJ, Banks, and Molthen from using Inhance's processes, specifications, designs, and customer pricing. In October 2015, the trial court entered a temporary injunction against TMRJ, Banks, and Molthen, prohibiting them from using or disclosing Inhance's proprietary processes and equipment.
The case went to trial in June 2016. Adrian Samaniego, Inhance's director of engineering and quality, testified for the company. He described the three steps of Inhance's proprietary fluorination process. The first uses a closed electrolytic cell that creates fluorine from hydrogen fluoride and captures fluorine gas. The second step of the process conveys and stores the fluorine gas at a regulated pressure. The third is application, involving a reactor and systems that apply a barrier treatment on plastic articles for the customer. Samaniego testified that "[t]he compilation of all of these factors that allows us to build our plants as cheaply and as efficiently as we do ... that constitutes our trade secret." He analogized the compilation to a cake recipe:
[C]akes have ... flour, they have butter, and they have sugar. What our trade secret is, is our recipe: the proportions, the dimensions, the amount of time you cook it for.... [Like the recipe for] Coca-Cola, for instance."
Inhance adduces expert testimony to support a royalty payment.
Inhance presented evidence of the amount of reasonable royalty it sought as *207 damages through James Woods. Woods holds a Ph.D. in finance and has experience and expertise in the valuation of trade secrets and other intellectual property. He calculated that a reasonable royalty for Inhance's trade secrets ranged from $6.7 million to $10.2 million. To arrive at this amount, he constructed a hypothetical negotiation that would have occurred at the time that TMRJ misappropriated or began using the trade-secret information. He considered (1) the actual or competitive posture of the parties; (2) the amount of money paid to purchase the trade secret or to license the trade secret in the past; (3) the total value of the trade secret to the plaintiff, including its development costs and its importance to the business; (4) the extent to which the defendants used the trade secret; and (5) any particular elements or factors relevant to the specific case.
For the first factor, Woods opined that:
If TMRJ were to enter the marketplace, it's unlikely that they could enlarge the market; all that they could do would be to take customers from Inhance. And so the entry of TMRJ into the marketplace would be a net loss for Inhance more likely than not.
For the second factor, Woods considered a $27-million price allocation for intangible assets from a company-valuation report that Inhance had recently solicited. Woods also considered, but gave significantly less weight to, a 1999 agreement to share technology know-how between one of Inhance's joint-venture partners in Australia and an Indian firm, which had an initial price of $150,000 and annual payments of $30,000 thereafter. As to the trade secrets' importance to Inhance's business, Woods testified that the ability to generate fluorine on-site without using bottled fluorine was critical to Inhance's business and a core piece of its trade secrets.
Because Inhance did not segregate the research-and-development costs that it incurred in creating its proprietary process, Woods relied on the estimated cost for creating a cell calculated by Gerardine Botte. Botte is an expert in the design of electrochemical-cell construction and operation, with emphasis in the area of fluorine-generation. Botte valued the first phase of design and production of the electrolytic cell for fluorine-gas production, the creation of a prototype, at $1.36 million. Botte valued the second phase, increasing the size of the cell, at $2.2 million. Botte valued the third phase, which involves testing and readying the up-scaled cell for commercial production, at $2.6 million. Botte also testified that the entire process to develop the electrolytic cell, starting with the available literature, would take about 27 months. Botte opined that the total cost for development of the cell in a commercial setting would be $10.2 million.
In contrast, TMRJ's valuation expert, Armando Chavez, opined that, assuming a hypothetical negotiation in the summer or fall of 2014, a reasonable royalty fell between $88,000 and $212,000. Woods disagreed with Chavez's estimate. He opined that Chavez's valuation relied too heavily on the Australian joint venture's 1999 licensing agreement. Woods testified that the licensing agreement was too old and that Chavez's valuation did not account for the fact that TMRJ and Inhance are direct competitors. Chavez disagreed with Woods' and Botte's reliance on the development-cost estimate.
The jury finds damages for royalties and lost profits.
The charge asked the jury, "What sum of money, if paid now in cash, would fairly and reasonably compensate Inhance for its damages, if any, caused by such misappropriation?" The question asked the jury to answer three possible measures of damages:
*208 (1) Inhance's lost profits, (2) the development costs that TMRJ avoided as a result of the misappropriation, and (3) a reasonable royalty for the use of Inhance's trade secrets. The jury found that $4 million constituted a reasonable royalty and also awarded $10,500 in lost profits. Inhance elected entry of judgment on the jury's reasonable-royalty and lost-profits findings, and it sought a permanent injunction. TMRJ does not contest the damages awards on appeal.
The trial court awards damages and a permanent injunction.
The trial court entered judgment on the verdict according to Inhance's election and entered a permanent injunction. The permanent injunction prohibits TMRJ from "using, disclosing, transferring, or possessing, in whole or in part, Inhance's trade secret information," and prohibits TMRJ from "operating, manufacturing, designing, transferring, selling or offering for sale fluorine generation, conveyance and application processes for systems that contain, are based on, or utilize, in whole or in part," trade secrets.
DISCUSSION
I. Standard of review
TMRJ challenges the trial court's permanent injunction, which we review for an abuse of discretion. See Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc. , 975 S.W.2d 546, 560 (Tex. 1998). Generally, a trial court retains discretion in deciding whether to grant a permanent or temporary injunction. See Webb v. Glenbrook Owners Ass'n, Inc. , 298 S.W.3d 374, 383 (Tex. App.-Dallas 2009, no pet.). An abuse of discretion occurs if a trial court (1) acts arbitrarily and unreasonably, without reference to guiding rules or principles, or (2) misapplies the law to the established facts of the case. Butler v. Arrow Mirror & Glass, Inc. , 51 S.W.3d 787, 791 (Tex. App.-Houston [1st Dist.] 2001, no pet.).
In considering whether the trial court acted within its discretion in awarding the permanent injunction in addition to damages, we consider whether the evidence supports: (1) the existence of a wrongful act, (2) the existence of imminent harm, (3) the existence of irreparable injury, and (4) the absence of an adequate remedy at law (like the actual damages awarded in this case). See Indian Beach Prop. Owners' Ass'n v. Linden , 222 S.W.3d 682, 690 (Tex. App.-Houston [1st. Dist.] 2007, no pet.).
II. Duplicative Remedies
TMRJ contends that Inhance is not entitled to both reasonable-royalty damages and permanent injunctive relief because they remedy the same future economic harm, creating an impermissible double recovery.
A. The one-satisfaction rule precludes duplicative remedies.
Under the one-satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered because of a particular injury. See Tony Gullo Motors I, L.P. v. Chapa , 212 S.W.3d 299, 303 (Tex. 2006) ; Stewart title Guar. Co. v. Sterling , 822 S.W.2d 1, 8 (Tex. 1991). A double recovery happens when a judgment awards a plaintiff more than one recovery for the same injury. Halliburton Energy Servs., Inc. v. Axis Techs., LLC , 444 S.W.3d 251, 263 (Tex. App.-Dallas 2014, no pet.) (citing Waite Hill Servs., Inc. v. World Class Metal Works, Inc. , 959 S.W.2d 182, 184 (Tex. 1998) (per curiam)). A party may seek damages based on alternative theories, but it is not entitled to a double recovery. See Waite Hill Servs. , 959 S.W.2d at 184 ;
*209 Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P. , 417 S.W.3d 46, 64 (Tex. App.-Houston [1st Dist.] 2013, pet. denied) ; Madison v. Williamson , 241 S.W.3d 145, 158 (Tex. App.-Houston [1st Dist.] 2007, pet. denied). When a remedy compensates for a separate and distinct injury, however, then it is not duplicative of another remedy. Madison , 241 S.W.3d at 158 ; accord Birchfield v. Texarkana Mem'l Hosp. , 747 S.W.2d 361, 367 (Tex. 1987). For example, a damages award that compensates a plaintiff for past damages combined with relief to prevent future damages does not constitute a double recovery. Halliburton Energy Servs. , 444 S.W.3d at 263 ; accord Marin Real Estate Partners, L.P. v. Vogt , 373 S.W.3d 57, 76-77 (Tex. App.-San Antonio 2011, no pet.).
B. The trial court reasonably concluded that the injunction and royalty awards were not duplicative.
In trade-secret-misappropriation cases, relief may take various forms, including (1) the value of the plaintiff's lost profits; (2) the defendant's unjust enrichment, that is, its actual profits from the use of the secret; (3) the value that a reasonably prudent investor would have paid for the trade secret; (4) the development costs the defendant avoided incurring through misappropriation; and (5) a reasonable royalty. See Bohnsack v. Varco, L.P. , 668 F.3d 262, 280 (5th Cir. 2012). A successful claimant may be entitled to these damages and injunctive relief to remedy the injury caused by the defendant's wrongful conduct. TEX. CIV. PRAC. & REM. CODE §§ 134A.003, 134A.004. But the availability of multiple remedies does not mean, as Inhance suggests, that a trial court may cumulate them all in violation of the one-satisfaction rule. See Pruske v. Nat'l Bank of Commerce of San Antonio , 533 S.W.2d 931, 934 (Tex. App.-San Antonio 1976) (holding that, although secured creditor's available remedies in Texas Business & Commerce Code are cumulative, "[the] secured party is entitled to only one satisfaction"), abrogated on other grounds by Greathouse v. Charter Nat'l Bank-Sw. , 851 S.W.2d 173 (Tex. 1992) ; Mehl v. Stern , No. 03-14-00697-CV, 2016 WL 4091359, at *5 (Tex. App.-Austin July 28, 2016, no pet.) (mem. op.) (holding that award of both damages and equitable rescission violates one-satisfaction rule).
TMRJ contends that the expert testimony contemplated the use of the misappropriated technology into the future, and thus the jury's award overlaps with the injunctive relief the trial court granted. It points out, for example, that Inhance's expert considered that "TMRJ would be using the trade secrets in direct competition with Inhance to produce fluorine on-site in exactly the same methodology." It also observes that the measure of damages submitted in the court's charge instructed the jury to consider the future use of the trade secrets and the effect of that use on the parties' competitive positions.
In determining a reasonable-royalty amount, the trial court instructed the jury to consider:
1) The resulting and foreseeable changes in the Parties' competitive positions;
2) Past prices that purchasers or licensees may have paid for the trade secret;
3) The total value of the trade secret to Inhance, including Inhance's development costs and the importance of the confidential information to Inhance's business;
4) The nature and extent of the Defendant's use of the trade secret; and
5) Whether an alternative process exists.
As further defined for the jury, the reasonable royalty was based on a fictional *210 negotiation of what "a willing buyer and a willing seller would have agreed upon, at the time of the misappropriation, as a fair price for the Defendants' use or disclosure of the trade secret." Cf. Sw. Energy Prod. Co. v. Berry-Helfand , 491 S.W.3d 699, 711 (Tex. 2016) (reasonable royalty "is calculated based on a fictional negotiation of what a willing licensor and licensee would have settled on as the value of the trade secret at the beginning of the infringement."). In other words, the jury was asked "to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place." Id. (quoting Mid-Mich. Comput.Sys., Inc. v. Marc Glassman, Inc. , 416 F.3d 505, 510-11 (6th Cir. 2005) ); Univ. Computing Co. v. Lykes-Youngstown Corp. , 504 F.2d 518, 539 (5th Cir. 1974). The concept, in application, asks what a tortfeasor would have paid had it bought the technology rather than misappropriated it. The jury charge's definitions thus incorporate both the future earnings of the tortfeasor and the loss of revenue and future worth to the owner in determining the present value of the technology.
The injunction prohibits future use of the trade secrets altogether. Both remedies conceivably redress Inhance's future economic injury caused by TMRJ. Based on the evidence presented, however, the trial court reasonably could have concluded that the reasonable-royalty damages did not make Inhance whole for two reasons.
First, in trade-secrets cases, royalty damages may be derived from the trade secrets' present value to the defendant, regardless of whether the plan to use them comes to fruition. See Univ. Computing , 504 F.2d at 536 (explaining that reasonable-royalty damages generally are available in cases where (1) trade secret has not been destroyed, (2) plaintiff cannot prove a specific injury, and (3) defendant has gained no actual profits by which to value worth to defendant of what it misappropriated). In this case, because the trial court granted a restraining order and eventually an injunction, TMRJ was in business for a short time, which ended well before trial. The reasonable-royalty damages awarded by the jury therefore were not based on actual future use of the trade secret. Instead, they compensate purely for the misappropriation of the technology, which has a present value based in part on potential for future use, regardless of whether that use came to fruition.
Second, the evidence in this case included testimony that the owner never intended the trade secrets to be commercially available. In the case of trade secrets that were never intended to be licensed, sold, or otherwise used by a third party, injunctive relief may not be duplicative of a reasonable royalty based on fair market value at the time of the appropriation. This measure does not fully compensate for misappropriation of a trade secret that the owner seeks to preserve for its exclusive use and would not sell. In King Instruments Corp. v. Perego , the United States Court of Appeals for the Federal Circuit illustrated the problem with applying a fair market value measure to patent-infringement cases when the protected intellectual property's owner holds the intellectual property exclusively with no intent to license it:
A hypothetical patentee could market a product covered by a patent and efficiently supply all demand for the product. A competitor seeking a license under the patent would not succeed. The patentee profits more by supplying the demand itself than by granting a license on terms which would allow the competitor *211 to reasonably operate. In this situation, no reasonable royalty exists. Willing negotiators, assuming they both act in their own best interests, would not agree to any royalty. The value of exercising the right to exclude is greater than the value of any economically feasible royalty. If the competitor infringes in this situation and the patentee can recover only a "reasonable royalty," the patentee does not receive "adequate compensation" as the statute requires. The same reasoning applies anytime the patent owner benefits more by excluding others than by licensing.
65 F.3d 941, 951 (Fed. Cir. 1995). Limiting recovery to a reasonable royalty, the Federal Circuit noted, "would give the infringer what the market denied-a license." Id.
Applying that principle here, we conclude that the trial court acted within its discretion in awarding injunctive relief in addition to the actual damages awarded by the jury. The parties do not dispute the availability of reasonable-royalty damages or the amount that the jury awarded as the value of the misappropriated trade secrets. Rather, TMRJ contends that the trial court's permanent injunction impermissibly overlaps with the reasonable-royalty damages.
Although the royalty determination conceivably included future revenue that licensing the trade secrets might have produced, the trial court reasonably could have concluded that this measure of actual damages did not fully compensate Inhance absent an injunction because Inhance never intended that the trade secrets be available in the marketplace. Inhance's long-term investment in developing fluorine-gas-production technology propelled it to a unique place in the surface fluorination market. It could produce fluorine gas for a fraction of the price of purchasing externally sourced fluorine gas, unlike its competitors. Because the surface-fluorination business caters to a limited number of customers, Inhance would necessarily lose a customer for each one gained by a competitor using Inhance's proprietary processes.
TMRJ relies on three cases to contend that the trial court erred in entering the permanent injunction in addition to damages. In DSC Communications Corp. v. Next Level Communications , 107 F.3d 322 (5th Cir. 1997), the trial court denied injunctive relief, determining that the jury's award fully compensated plaintiff for the defendant competing company's theft of trade secrets. 107 F.3d at 328. The Fifth Circuit affirmed, holding that the ruling was within the trial court's discretion. Id. For the reasons discussed above, the evidence in this case supports the trial court's exercise of its discretion to award injunctive relief based on its weighing of whether a fair market value determination as of the time of the appropriation fully compensated Inhance for its exclusive competitive advantage.
In Schneider National Carriers, Inc. v. Bates , 147 S.W.3d 264 (Tex. 2004), the court noted that damages for a permanent nuisance include those expected to incur in the future, and thus awarding a permanent injunction for the same future effects would constitute double recovery. See 147 S.W.3d at 284-85. The court noted "a rule of general application" that awarding injunctive relief in addition to damages is a double recovery when the actual damages concern "future effects" of the breaching party's breach. See id. In contrast here, the trial court heard evidence that went beyond the market value of the technology and that it was in Inhance's competitive interest never to sell or license it. Based on this evidence, the trial court reasonably could have concluded that compensation for the value of the trade secrets alone did *212 not make Inhance whole because, but for the defendants' breach, no competitor would ever have come to possess the trade secrets.
In Boudreaux v. Culver , No. 01-03-01247-CV, 2005 WL 1111237 (Tex. App.-Houston [1st Dist.] May 5, 2005, no pet.) (mem. op.), this Court reversed a judgment after a jury verdict that had both granted a permanent injunction to a landowner and awarded the landowner damages to remedy permanent water damage to the landowner's property. 2005 WL 1111237, at *5. This was an impermissible double recovery because the money damages and the injunction addressed the same injury. Id. Like Schneider National Carriers , Boudreaux also is distinguishable because the damages awarded there necessarily remedied future harm also covered by the injunction. Here, the reasonable royalty damages did not necessarily remedy future harm related to Inhance's right to exclusive use.
The injunction protects against future exploitation of Inhance's trade secrets, which were never intended to be available at any market price. Accordingly, we hold that the trial court acted within its discretion in granting the injunction in addition to awarding actual damages.
III. The permanent injunction does not adequately delineate the prohibited conduct.
TMRJ next complains that trial court erred in entering a permanent injunction that is indefinite and precludes lawful activity.
A. Applicable law
"Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained...." TEX. R. CIV. P. 683. An injunction must be "in clear, specific and unambiguous terms" so that the party enjoined can understand the duties or obligations imposed by the injunction and so that the court can determine whether the injunction has been violated. See Ex parte Blasingame , 748 S.W.2d 444, 446 (Tex. 1988) (orig. proceeding). An injunction "must be as definite, clear, and precise as possible...." Computek Comput. & Office Supplies, Inc. v. Walton , 156 S.W.3d 217, 220-21 (Tex. App.-Dallas 2005, no pet.). Further, an injunction must be narrowly tailored to address the offending conduct-it must not be so broad that it would enjoin a defendant from acting within its lawful rights. See Hellenic Inv., Inc. v. Kroger Co. , 766 S.W.2d 861, 866 (Tex. App.-Houston [1st Dist.] 1989, no writ) ; accord Webb , 298 S.W.3d at 384 (citing Hitt v. Mabry , 687 S.W.2d 791, 795 (Tex. App.-San Antonio 1985, no writ) ).
B. The permanent injunction does not adequately define the conduct that it restrains.
The trial court's permanent injunction tracked the jury charge. In the jury question on liability for misappropriation, the jury was asked whether Inhance possessed a number of trade secrets, each of which was described as a "compilation of specified data:"
a. The compilation of specified data for the production of Inhance's fluorine cell;
b. The compilation of specified data for Inhance's fluorine creation processes;
c. The compilation of specified data for Inhance's fluorine conveyance equipment;
*213 d. The compilation of specified data for Inhance's fluorine conveyance processes;
e. The compilation of specified data for Inhance's fluorine application equipment;
f. The compilation of specified data for Inhance's fluorine application processes;
g. The compilation of specified data for Inhance's pricing information; and
h. The compilation of specified data for Inhance's profit margin information.
The trial court's injunction prohibits TMRJ from "using, disclosing, transferring, or possessing, in whole or in part, Inhance's trade secret information" as set forth in (a) through (h).
The injunction also prohibits TMRJ from operating, manufacturing, designing, transferring, selling, or offering for sale fluorine-generation, conveyance and application processes for systems that contain, are based on, or utilize, in whole or in part, Inhance's "trade secrets" related to the production of Inhance's fluorine cell and to Inhance's fluorine-creation process, fluorine-conveyance equipment, fluorine-conveyance processes, fluorine-application equipment, and fluorine-application process.
The injunction does not delineate the protected "compilation[s] of specified data" that constitute the trade-secret-protected data. The indefinite "specified data" and general description of "trade secrets" does not give adequate notice of the prohibited conduct in this case, in which some fluorine-manufacturing processes are not technology owned nor uniquely developed by Inhance, but rather are publicly available. Because the parameters of the restrained conduct are not sufficiently specific, the injunction does not distinguish between the unique, protected elements of Inhance's data compilations, processes, or equipment from that which Inhance's competitors use throughout the industry. The injunction prohibits TMRJ from providing some of the same fluorine-application services that Inhance's competitors and suppliers provide. Because the injunction prohibits lawful competition, we hold that it is too broad. See Hellenic Inv. , 766 S.W.2d at 866 ("[A]n injunctive decree should not be framed so broadly as to prohibit the enjoyment of lawful rights."); TEX. R. CIV. P. 683.
Inhance responds by tying the injunction's terms to snippets of trial testimony, but that testimony was not described, summarized, or otherwise made part of the injunction. The evidence supporting injunctive relief cannot substitute for a reasonable description of the prohibited conduct. See TEX. R. CIV. P. 683 (requiring order granting injunction to set forth required descriptive language without reference to other documents). Requiring that an enjoined party search for evidence to understand what conduct is enjoined undermines the purposes of an injunction, which are to remedy specific harm and to provide notice of the prohibited conduct.
The injunction in this case is much broader than others that have been upheld in connection with particular products, processes, or aspects of a business. Inhance relies on IAC, Ltd. v. Bell Helicopter Textron, Inc., 160 S.W.3d 191 (Tex. App.-Fort Worth 2005, no pet.), and Halliburton Energy Services . But neither case supports affirming an injunction, like the one here, that is so broad that it can be read to prohibit all commercial use of fluorine. In IAC , the injunction prohibited using information pertaining to Bell's 206B and OH-58 helicopter blades, but not all helicopter blades. See IAC , 160 S.W.3d at 202. Based on this identifying information, *214 the IAC court overruled a challenge to the injunction because the parameters of the prohibited conduct were "apparent from the text." Id. Unlike the injunction in IAC , there is nothing reasonably apparent in the text of the trial court's order that precisely identifies the restrained conduct.
Similarly, in Halliburton Energy Services , the court of appeals overruled a challenge to an injunction that prohibited the manufacture and sale of a specific well plug that the defendants had developed using trade secrets misappropriated from Halliburton. See Halliburton Energy Servs. , 444 S.W.3d at 260-64. The injunction described its prohibitions by referring to specialized components (for example, Halliburton's frac plugs, bridge plugs, and packers), Halliburton's testing information, and its information regarding specific alloys used in connection with the identified well plug. See id. at 264. In contrast, the injunction in this case does not delineate or describe the trade secrets in connection with a specific product or process, but rather defines the universe of fluorination equipment and processes Inhance uses as protected trade secrets.
Inhance also relies on T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc. , 965 S.W.2d 18 (Tex. App.-Houston [1st Dist.] 1998, pet dism'd). There, however, our court held that the trial court's temporary injunction was overbroad because it prohibited the use and disclosure of any information or services relating to the repair and warranty schedule for particular cars. T-N-T Motorsports , 965 S.W.2d at 25-26. Our court revised the injunction to limit restraint to the plaintiff's trade secrets, and the parties did not otherwise contest that the trade secrets were adequately defined in the injunction. See ids="11827903" index="48" url="https://cite.case.law/sw2d/965/18/">id. For this reason, T-N-T Motorsports is inapplicable to this case.
Finally, Inhance contends that, notwithstanding any imprecision in the injunction, TMRJ understands what conduct is prohibited because Molthen and Banks possess "profound knowledge" that make them "keenly aware of what is restricted." But the injunction, by failing to precisely describe the restrained conduct, arguably prohibits any and all involvement in the fluorination business. By defining the prohibited conduct so broadly, the injunction restrains lawful competition rather than merely restraining the use of ill-gotten trade secrets. See Hellenic Inv. , 766 S.W.2d at 866 ; see also Sharma v. Vinmar Int'l, Ltd., 231 S.W.3d 405, 436 (Tex. App.-Houston [14th Dist.] 2007, no pet.) (Guzman, J. concurring) (noting that injunction is "impermissibly overbroad if it prohibits not only the use of confidential and proprietary information, but lawful conduct as well."); Kulkarni v. Braeburn Valley W. Civic Ass'n, Inc., 880 S.W.2d 277, 278 (Tex. App.-Houston [14th Dist.] 1994, no writ) ; Sw. Res. Inst. v. Keraplast Techs., Ltd. , 103 S.W.3d 478, 482-83 (Tex. App.-San Antonio 2003, no pet.).
We may not overlook Rule 683's requirements that a permanent injunction be "specific in terms" and "describe in reasonable detail ... the act or acts sought to be restrained." TEX. R. CIV. P. 683 ; see Blasingame , 748 S.W.2d at 446 ("Interpretation of the provisions of the court order in question should not rest upon implication or conjecture."); Cooper Valves, LLC v. ValvTechnologies, Inc. , 531 S.W.3d 254, 266 (Tex. App.-Houston [14th Dist.] 2017, no pet.) (an injunction "should inform a party of the acts he is restrained from doing without requiring inferences or conclusions about which persons might disagree and which might require additional court hearings.")
Because the injunction does not adequately identify the acts that it restrains, *215 we hold that it does not comply with the requirements of Texas Rule of Civil Procedure 683. We therefore reverse the portion of the judgment containing the permanent injunction and remand the case to the trial court for further proceedings consistent with this opinion.
CONCLUSION
We reverse the permanent injunction and remand the determination of injunctive relief for further proceedings. We affirm the remainder of the judgment.