**AVERY DENNISON CORPORATION,**
**Plaintiff–Appellee,**

v.

**FOUR PILLARS ENTERPRISE CO.**
**and P.Y. Young, Defendants–**
**Appellants.**

Nos. 00–4020, 00–4128, 00–4233.

United States Court of Appeals,
Sixth Circuit.

Sept. 3, 2002.

480

Before RYAN and BOGGS, Circuit Judges; and HAYNES, District Judge.*

PER CURIAM.

Four Pillars (FP) appeals the jury verdict and the district court's denial of judgment as a matter of law and *remittitur* in this combined RICO and state law action for misappropriation of trade secrets, unjust enrichment, civil conspiracy, unfair competition, and conversion brought by Avery Dennison Corporation. FP argues that the district court abused its discretion by failing to screen the methodologies and factual foundations of Avery's witnesses for scientific acceptability. FP also asserts that the judge abused his discretion

* The Honorable William J. Haynes, United States District Judge for the Middle District of

Tennessee, sitting by designation.

by not severing the trial of co-conspirator Tenhong Lee from the FP trial. Finally, FP alleges that the jury award of both state-law and RICO damages was improperly duplicative, that the judge incorrectly determined that the jury meant to impose damages separately for misappropriation and for other state law claims, that the jury verdict was excessive, and that the judge erred in failing to grant a *remittitur* of damages.

Because the "facts" that FP believes the district court should have reviewed for scientific veracity are rather the underlying questions of liability in the case, we affirm the decision of the district court to allow the expert witness testimony. We also affirm the district court's refusal to sever the trial, because defendants did not join the motion to sever when it was originally made. Finally, we affirm the jury verdict as correctly calculated, and affirm the district court's decision to refuse *remittitur*, because the jury verdict was not based on mistake or so excessive as to shock the conscience.

## II

Avery Dennison is the world leader in the creation of pressure-sensitive adhesive labels; the company invests considerable time and effort in researching new adhesive products. In 1996, Avery discovered that FP, a Taiwanese competitor, was paying Avery scientist Dr. Tenhong Lee to provide FP with Avery adhesive formulas, manufacturing techniques, product specifications, and other fruits of Avery's research.

Avery contacted the FBI. The FBI confronted Lee after they videotaped him stealing confidential Avery documents. Lee confessed to stealing Avery formulas and other confidential information for eight years, and passing them on to FP.

On September 4, 1997, the FBI arranged and videotaped a meeting between Lee, P.Y. Young, Chairman of FP, and Sally Yang, an FP manager. The videotape showed Young accepting Avery confidential materials, removing Avery's confidential markings from the materials, and discussing how Four Pillars could use the information, and what sorts of thefts Lee should make next. Young and FP were convicted of conspiracy and attempt to violate the Economic Espionage Act, 18 U.S.C. § 1832(a)(4),(5).

Avery then brought suit against Lee and FP for (1) violation of the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1962(c) and 1964(c); (2) conspiracy to violate RICO; (3) conspiracy; (4) misappropriation of trade secrets; (5) unfair competition; (6) conversion; and (7) unjust enrichment. Avery also sued Lee for fraud. Avery settled with Lee before trial. The settlement was partial: Lee conceded liability, and Avery agreed to limit the damages for which Lee could be held accountable to $160,000. Lee also agreed, as part of the settlement, to testify on Avery's behalf as to the nature and extent of the conspiracy.

At trial, Avery produced expert and lay testimony in support of its claim that FP used Avery manufacturing procedures (compounding specifications) and formulas in making and modifying adhesive products, and in overhauling its research and manufacturing methods. FP did not produce exact copies of Avery products, nor did it bring directly competing products to market; rather, as Young stated on the FBI videotape, "[a]s a research institute, we do not need to copy the thing. We can modify it." In all, FP misappropriated 71 formulas and matching manufacturing instructions for Avery products. FP made multiple copies of these formulas, and attempted to reproduce the formulas. FP

successfully copied Avery's S–246 flagship label adhesive, and modified it. Five copies of the compounding specification for S–246 and four copies of an S–246 laboratory notebook page were in FP's files. FP also received research memoranda concerning upcoming products and Avery's newly developed "high speed release" manufacturing techniques. Lee gave FP two Avery research reports, multiple copies of which were found in FP's files. Lee stressed to FP that the reports were /"extremely confidential" and were the "fruit of painstaking work of Avery Research Center over a period of several years." FP obtained copies of a confidential Avery report on 5–roll coating; FP purchased a 5–roll coater and used it to create new products.

FP also obtained and used Avery's specifications for the paper used in its adhesive labels. FP introduced new thermal label products after Lee provided it with thermal label paper specifications and supplier information. Lee also provided FP with Avery's test methods. FP removed references to Avery, and distributed the methods for use in its R & D laboratory.

Based on their opinions that FP had misappropriated Avery secrets, Avery's witnesses proposed several theories for the calculation of damages to which FP objected. John Neels, an Avery damages witness, presented three theories of recovery: defendant's profits, defendant's avoided costs, and reasonable royalty.

The jury returned a verdict in Avery's favor. The verdict included $10 million on Avery's RICO claims; $10 million on the misappropriation claim; $10 million on the civil conspiracy and conversion claims; $25 million in punitive damages; $5 million against Young personally; and $160,000 against Lee. The district court tripled the RICO award under 18 U.S.C. § 1964(c). The total jury verdict was for $81,358,110,

including attorneys' fees and costs. FP then appealed the matter to this court.

## A. *Daubert* and Expert Testimony

We review a district court's ruling on the admissibility of expert testimony for an abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A court examines expert witness testimony, under Rule 702, for reliability and relevance. In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that judges are to serve a gatekeeper function with respect to such expert testimony. *Daubert* set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony. Fed.R.Evid. 702 (advisory notes). "The specific factors explicated by the *Daubert* court are (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community." *Ibid.* The list is not exclusive:

courts have found, for example, that experts pass *Daubert* screening if they are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation...." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995). In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court extended the *Daubert* analysis to non-scientific expert testimony.

*Daubert* held that the "focus, of course, must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. However, the two are not unrelated. A court may question the validity of an expert's testimony when he uses accepted methods to achieve highly anomalous results. Fed.R.Evid. 702 (advisory notes). For this reason, Rule 702 explicitly states that the court must review whether or not the methods are reliably applied to the facts of the case. Our precedent indicates that the court should confirm that "the factual underpinnings of the expert's opinion were sound." *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir.1999). However, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

Federal Rule of Evidence 701 governs the testimony of lay witnesses. At the time of trial, the Rule read:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

After the trial, Rule 701 was amended in 2000 to prohibit lay opinion testimony that was "based on scientific, technical or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701 (2001). The amendment was to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed.R.Evid. 701 (advisory notes).

Although a court is required to act as a gatekeeper, and should protect the jury from scientifically unsound testimony, there is no requirement that a judge hold a formal *Daubert* hearing. *Greenwell v. Boatwright*, 184 F.3d 492 (6th Cir.1999). The judge must simply keep watch over the proceedings, and, with the aid of objections from council, eliminate methodologically unsound or irrelevant expert testimony.

1. Lay Testimony: Decoding Avery Formulas

At trial, Avery presented testimony by one of its employees, Norman Conti. Conti's testimony consisted, in large part, of explaining the code used by Avery to protect its formulas. Essentially, two documents were needed in order to use an Avery formula. The ingredients list was kept separate from the formulas, so that a person stealing a formula would know the chemical amounts, but not the ingredients, to use in creation of the product. Conti explained how to read the code, and also testified as to whether handwritten notations on the formula pages indicated that someone at FP had tried to decode or modify the formulas. Conti also testified as to the cost of developing a new adhesive, based on his work on some of the adhesives that had been stolen. Conti was offered as a lay witness under the old Rule 701. The district court permitted Conti to

testify about the attempts of FP to decode and modify the Avery formulas, and the cost of development of Avery formulas based on "things he knows from his experience and work."

FP argues that the court should have excluded Conti's testimony under *Daubert* even though Conti was properly admitted to testify as a lay witness under the then-governing Rule 701. It is an open question whether, prior to the amendment of Rule 701, such sophisticated lay testimony even fell under Rule 702's requirement that a court act as the arbiter of scientific reliability and relevance. However, we need not answer that question to decide this case. Assuming that *Daubert* applies, we find no reason that the district court should have excluded Conti's testimony on the grounds that it lacked either reliability or relevance.

FP offers no challenge at all to the reliability or the relevance of Conti's statements, rather, it chooses to challenge his conclusions. FP argues that Conti's estimation of the cost of creation of an Avery product should have been excluded under *Daubert*. Because the cost of the product was estimated rather than "proven," they argue, Conti's estimation was insufficiently reliable to meet the *Daubert* standard. This is not a valid basis for contesting Conti's testimony. *Greenwell*, 184 F.3d at 497–98 ("[Plaintiffs] challenge the inferences made by the expert and the jury from [expert] evidence. The testimony cannot be excluded on those grounds."). Conti testified that he relied on his personal knowledge, review of project plans, salary information, and interviews of Avery employees with experience in adhesive development. The estimate was not groundless. FP had and took the opportunity to cross-examine Conti extensively on the weaknesses of his testimony at trial; under *Daubert*, that is the proper way to challenge expert witness testimony that is weak, rather than methodologically unsound or irrelevant. *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

We find Conti's testimony both relevant and reliable. Conti's testimony was directly relevant to the central question of the case: whether FP was able to make use of the stolen technology. Further, there is no serious challenge to the reliability of Conti's methodology. He was intimately familiar with the Avery code system, and his explanation of the code system helped the jurors to understand a key portion of the physical evidence before them. His product cost estimates were not based on speculation, but on personal experience developing Avery products. Because Conti's testimony was both reliable and relevant, we find no abuse of discretion in the district court's judgment that such testimony should be allowed to go before the jury.

2. Damages Calculations for Misappropration of Trade Secrets.

■ Damages in trade secrets cases are difficult to calculate, because the offending company has mixed the profits and savings from increased quality and quantity of products, as well as savings from reduced research costs of research and production, with its own natural profits. *See* Michael A. Rosenhouse, *Proper Measure and Elements of Damages for Misappropriation of Trade Secrets*, 11 A.L.R.4th 12 (1982). When the misappropriated trade secret is used to field competing products, the best measure of damages is the plaintiff's lost profits or the defendant's illicit gains. However, where the misappropriated secrets were not directly used to field competing products, but were used, for example, to save research and manufacturing resources, plaintiffs have used a number of different methods of calculation to determine damages.

The Uniform Trade Secrets Act, as enacted by Ohio, reads:

> Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant in a civil action is entitled to recover damages for misappropriation. Damages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty that is equitable under the circumstances considering the loss to the complainant, the benefit to the misappropriator, or both, for a misappropriator's unauthorized disclosure of a trade secret.

O.R.C. 1333.63(A) (West 1994). Scant Ohio caselaw interprets this section. However, O.R.C. 1333.68 instructs us to construe the provisions of the Act "to effectuate their general purpose to make uniform the law with respect to their subject among states enacting them." We therefore draw on the law of other jurisdictions as well to aid us in construing the Ohio statute.

Where a trade secret has not been destroyed and where the plaintiff is unable to prove specific injury, courts measure the value of the secret to the defendant. *See, e.g., University Computing Co. v. Lykes–Youngstown Corp.,* 504 F.2d 518, 535–36 (5th Cir.1974). If the benefit to the defendant in terms of direct profits is not ascertainable, damages may be awarded based on the value to the defendant of the secret at the time of misappropriation, the value derived from savings because of increased productivity, or the value derived from savings in research costs. *Ibid.* (increase in productivity a proper basis for damages for misappropriation of trade secrets); *Reinforced Molding Corp. v. General Electric Co.,* 592 F.Supp. 1083 (W.D.Pa.1984) (same).

■ In this case, FP did not use the stolen trade secrets to bring directly competing products to market. Rather, FP used the Avery secrets to create a panoply of new products, save significantly on time and resources devoted to research, and streamline their manufacturing processes. Avery's theories of damages therefore concentrated on the benefits that FP derived from the use of the secrets. John Neels, an economist and Avery's damages expert, presented three theories of damages: reasonable royalty, defendant's profits, and defendant's avoided costs.[1]

FP moved *in limine* to exclude Neels's testimony, based on its reading of *Daubert.* The court considered Neels's testimony in light of *Daubert,* and determined that Neels's methods of damage calculation were relevant and reliable enough to go before the jury. FP argues here that Neels's testimony was inadmissible as scientifically unreliable, under *Daubert,* because his calculations proceeded from

---

1. Neels also discussed a damages theory, termed "loss of control," that sought to recapture damages sustained by Avery as a result of the fact that Avery no longer controlled the formulas and technologies. The idea is simple—Avery is diminished because FP can pass Avery secrets and technologies on to even more competitors. Neels did not place a specific monetary amount on this loss. FP argues that this brief discussion of "loss of control" allowed the jury to engage in open ended speculation as to the amount of damages. The theory was not pursued, however, except to the extent that Neels's reasonable royalty calculation took into account the open-ended nature of the hypothetical license agreement in determining a $73 million amount.

several assumptions: that FP misappropriated trade secrets from Avery, that FP used and modified such technology, and that the use of the stolen Avery technology saved FP money. Although a *Daubert* challenge may certainly include arguments that the expert theory is invalid because it has no basis in fact, we do not conclude that the district court abused its discretion by determining that Neels's theories were sufficiently factually supported. The "facts" challenged by FP here are not scientific facts to be evaluated under *Daubert*, but are rather the central questions of liability in the case, which were properly presented to the jury.

Finally, FP points out that a reasonable royalty may not be used as a damages method where no evidence of commercial use was established. FP's definition of commercial use is unduly restrictive. The concept of commercial use is not limited to the fielding of directly competing products. *See, e.g., University Computing*, 504 F.2d at 536–37 (damages based on benefit to the defendant proper, on a "reasonable royalty" theory, when the defendant never successfully brought the product to market). Rather, courts seeking to establish a reasonable royalty measure the value of the secret to the defendant at the time that it was misappropriated, regardless of the commercial success of the enterprise. *Ibid.* Here, FP did not directly copy Avery's products; rather, it modified Avery formulas, and used Avery's manu-

facturing specifications to cut their own research time and streamline its manufacturing processes. Avery was not required to produce evidence of direct product copying. *See, e.g., Pioneer Hi–Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1239 (8th Cir.1994) ("[T]he fact that [a defendant] may have altered [a trade] secret does not insulate it from liability."). Avery presented relevant and admissible evidence showing that FP valued, deciphered, modified, and used Avery trade secrets; it was not required to do more.[2] We therefore conclude that the district court's decision to allow the testimony was within its discretion.

### 3. Severance

■ Lee, Young, and FP were all defendants in the trial. Lee concluded a settlement agreement with Avery pursuant to which he testified to the nature and extent of the theft of Avery's trade secrets by the conspirators. On appeal, FP asserts that the district court should have severed the trial, because Lee's testimony prejudiced the jury against FP. As a preliminary matter, FP's arguments on this issue are not properly before us: the original motion for severance was made by Lee, because he believed he was insufficiently prepared for trial. FP's argument, that the trials should have been severed because of undue prejudice to FP, was not presented to the district court; the issue was therefore not preserved for appeal. *Thurman v.*

---

**2.** In relation to this argument, FP alleges that Avery did not state with specificity which trade secrets were misappropriated, or tie them to any FP products. They base this claim on the district court's statement that it was impossible to determine which items were found to be trade secrets. This is a misquotation of the record. The court denied Avery's Application for Injunctive Relief, filed after trial. In so doing, the court stated: "It is certain from the Jury's Answers to Interrog-

atories and the General Verdict that Four Pillars or P.Y. Young made use of trade secrets, but it is uncertain which items specifically were found to be trade secrets." In denying injunctive relief, therefore, the court merely admitted that it was unable to determine which trade secrets the jury had relied on in making their findings, not that Avery had made an insufficient showing of FP's use of stolen Avery technologies.

*Yellow Freight Sys., Inc.,* 97 F.3d 833, 835 (6th Cir.1996).

Further, Lee has not appealed. Even were we to determine that he was not properly a party below, we would not dismiss claims against a party who has decided not to appeal. Finally, because there would be no reason to exclude Lee's testimony in a separate trial, the dismissal of Lee as a party would have had no impact on the testimony offered against Four Pillars.

4. RICO and State–Law Damages.

■ FP appeals the denial of its motion to amend the judgment, based on the argument that Avery could not recover for both RICO and state-law claims. The district court held that Avery was entitled to recover for both types of claims.

The question is not settled in this circuit. FP argues that the district court erred by imposing damages for both the RICO violation and for state-law misappropriation. The jury found FP liable both for RICO violations and for various state law claims. FP argues that recovery for both RICO and state-law violations is an "impermissible double recovery." FP cites several unpublished cases for the proposition that RICO damages and state-law damages may not be recovered for the same alleged conduct. *See, e.g., AIG Aviation, Inc. v. Boorom Aircraft, Inc.,* 142 F.3d 431, Nos. 96–1503, 96–1563, 96–1582, 1998 U.S.App. LEXIS 2143 (6th Cir. Feb.11, 1998) (unpublished) ("We note that there is no reason for the jury or the district court to fear a double recovery. Just as these are alternative claims, the damages are alternative as well; AIG will recover the larger of either the state-law damages or the RICO damages.").

However, as the district court noted, because the claims in *AIG were* alternative, the question of whether or not non-alternative claims could yield two damage awards based on the same conduct was not presented to the *AIG* panel. Noting the unpublished nature of the *AIG* decision, the district court instead adopted as its guide the Ninth Circuit's opinion in *Neibel v. Trans World Assurance Co.,* 108 F.3d 1123, 1130 (9th Cir.1997). *Neibel* stated: "we cannot ignore the text of RICO itself, which states: 'Nothing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title.'" *Neibel,* 108 F.3d at 1130.

We agree with *Neibel* and the district court. Congress intended RICO to impose stringent civil penalties on organized illegal activity, above and beyond state-law remedies already available. There is no barrier to applying RICO as written; we therefore adopt the reasoning of *Neibel* and do so.

5. Calculation of State-law Claims

■ FP alleges that the district court erred in interpreting the jury verdict to impose $10 million for misappropriation of trade secrets, and a separate $10 million for civil conspiracy, conversion, and other state-law claims. The jury's responses to interrogatories were recorded on a verdict form. FP argues that the headings for two of the claims categories are confusing: the first interrogatory asks what damages to be allocated for misappropriation of trade secrets; the later interrogatory asks what damages should be ascribed to misappropriation of trade secrets along with conversion and civil conspiracy.

■ Courts faced with apparent incongruities in a jury verdict construe the jury's decision to form a whole that expresses a coherent and reasonable view of the case. *Morales v. American Honda*

*Motor Co.*, 151 F.3d 500, 509 (6th Cir. 1998). FP argues that the jury imposed $10 million for misappropriation of trade secrets, and then recorded that same $10 million under a heading entitled "Civil Conspiracy and / or Misappropriation and / or Unfair Competition and / or Conversion." FP essentially treats the later damages line as a sum of the previous headings.

Avery argues that the jury meant to award two $10 million awards, the first for misappropriation, and the second for the other state law claims. Avery's position draws support from the verdict form: the jury found FP specifically liable on the conspiracy, conversion, and unfair competition claims. On each previous, unmixed count (RICO and misappropriation), the jury had found FP liable for $10 million. There was no other place in the interrogatories to record a damages amount for conversion and civil conspiracy.

We note that neither party objected to the verdict form beforehand, despite the obvious strangeness of a form that contained no independent damages line for several causes of action, and included misappropriation in two headers. The district court's determination that the jury intended to award $10 million for the other state law counts was reasonable, and gave effect to each part of the jury's verdict.

6. Remittitur

■■■ We review the district court's denial of *remittitur* for abuse of discretion. *Gregory v. Shelby County*, 220 F.3d 433, 443 (6th Cir.2000). FP argues that the district court abused its discretion in failing to reduce the jury verdict amount. A jury verdict is properly reduced when, viewing all of the evidence in the light most favorable to the plaintiff, the court finds that the verdict is "clearly excessive, resulted from passion, bias or prejudice;

or is so excessive or inadequate as to shock the judicial conscience of the court." *Gregory*, 220 F.3d at 443.

■■■ Under Ohio law, punitive damages may be awarded in a trade secret case if the plaintiff establishes that the defendant acted with malice. *Pyromatics v. Petruziello*, 7 Ohio App.3d 131, 454 N.E.2d 588 (1983). Malice does not require, however, an intent to injure. *Malone v. Courtyard by Marriott Ltd. Partnership*, 74 Ohio St.3d 440, 659 N.E.2d 1242 (Ohio 1996). The element of malice can be established by proof of conscious, deliberate, or intentional wrongdoing, or by showing that the defendant had a conscious disregard for the rights of other persons. *Id.* at 1247–48.

FP makes two related arguments. First, FP points out that the jury found that FP did not act with intent to injure Avery's business. FP incorrectly asserts that this precludes a finding by the jury that FP acted with malice. As noted above, intent to injure is not a requirement of malice under Ohio law. Second, FP argues that the verdict is excessive in light of the evidence. The jury had before it evidence that FP conspired with Lee to steal many millions of dollars worth of research and development, manufacturing techniques, product specifications, formulas, and even information about suppliers. The jury was presented with detailed testimony regarding Avery's costs of research, and the degree to which Avery technologies were converted and used by FP. Given the longstanding and organized nature of the misappropriation, the jury was justified in its damages award.

Finally, FP asserts that *remittitur* was required, because the punitive damages award was almost double the net worth of Four Pillars. FP argues that the only evidence at trial of FP's ability to pay was Avery testimony estimating the net worth

of FP at \$13–15 million. However, Avery is not required to put on testimony regarding FP's ability to pay; if FP wishes *remittitur*, it is incumbent upon it to provide the numbers. *See, e.g., Kemezy v. Peters*, 79 F.3d 33, 36 (7th Cir.1996) ("It ill becomes defendants to argue that plaintiffs must introduce evidence of the defendant's wealth.").

The jury verdict was supported by the evidence, and was commensurate with the acts for which the jury found FP liable. The verdict neither shocked the conscience, nor was the product of mistake. The district court did not, therefore, abuse its discretion in refusing *remittitur*.

### III

For the above reasons, we AFFIRM the district court's refusal to grant defendants summary judgment, a new trial, an amendment of the verdict, or *remittitur*.