**MAR OIL COMPANY, Plaintiff**

v.

**Myron KORPAN, et al., Defendants.**

**Case No. 3:11CV1261.**

United States District Court, N.D. Ohio, Western Division.

Sept. 4, 2013.

Maryia Y. Jones, Jason E. Manning, Troutman Sanders, Virginia Beach, VA, Thomas P. Dillon, Rebecca E. Shope, Shumaker, Loop & Kendrick, Toledo, OH, for Plaintiff.

John B. Schomer, Leigh A. Maxa, Krugliak, Wilkins, Griffiths & Dougherty, Akron, OH, Stephan R. Wright, Fleissner, Davis & Johnson, Chattanooga, TN, William D. Elsom, Jeffrey W. Steidley, Steidley & Elsom, Houston, TX, for Defendants.

## ORDER

JAMES G. CARR, Senior District Judge.

Plaintiff MAR Oil Company (MAR) has sued several defendants, principally among them, for purposes of this order, defendants Myron Korpan, Ronald Brock, and Solstice Energy Partners (SEP), for trade secret misappropriation in violation of the Ohio Uniform Trade Secrets Act (TSA), O.R.C. § 1333.61 *et seq.* MAR alleges that defendants improperly used its confidential and proprietary information, including seismic data, to lease land and drill in Northwest Ohio for oil and natural gas without expending the costs or time that MAR incurred for research and development.

Jurisdiction is proper under 28 U.S.C. § 1332.

Pending are Brock's and SEP's motions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to exclude testimony by MAR's expert Arthur Berman. (Docs. 156, 158). For the reasons that follow, I grant in part and deny in part each motion.

### Background

On January 27, 2000, MAR entered into a Consulting and Gross Overriding Royal-

ty Interest (GORI) Agreement with Myron Korpan as its consultant for exploring oil and gas reserves and leasing land in Northwest Ohio. The agreement stated:

> This area will also be treated as an area of mutual interest ... Myron [Korpan] agrees that this is an area of non competition and may not pursue an exploration venture on his own or with any other party without the permission of Wayne Toole. Previous and future information on this area is to be held confidential.

(Doc. 19–1 at 1).

On July 2, 2002, MAR and Korpan entered into a superseding Gross Overriding Royalty Agreement (GORA), incorporating the prior GORI Agreement but changing and further codifying some of the terms. These changes related primarily to the scope of the area of mutual interest. The agreement expired on January 27, 2005, subject to extension or renewal.

During the term of the GORA, MAR invested millions of dollars in exploration, including the production of seismic readings. MAR considers the seismic data among its confidential trade secrets. Korpan had access to the seismic data during his time consulting for MAR.

MAR and Korpan did not extend the GORA past January 27, 2005. Since the end of his contractual involvement with MAR in 2005, Korpan has retained certain materials relating to MAR's exploration for oil and gas reserves. These materials contain information about MAR's efforts, and include some of MAR's seismic readings.

In 2008, Korpan began working with Brock and SEP to lease land and explore for oil and gas reserves in the area of mutual interest that was the subject of the GORA. MAR held a lease on what is referred to as "the Johnson property," but let that lease lapse. On November 22, 2010, after discovering defendants' subsequent lease on that land, MAR e-mailed Korpan to ask if he was involved in the other defendants' leasing and exploration efforts. Korpan promptly confirmed his involvement with them.

Defendants have multiple leases within the previously designated area of mutual interest. Some border directly on plaintiff's leases.

MAR sued defendants seeking lost profits and other monetary damages, including the loss of prospective investment. MAR contends that, due to its conflict with Korpan and SEP, it lost a potential initial investment of at least $800,000 and a longer-term investment of millions of dollars by Marksmen Energy Inc. (Marksmen).

MAR designated geologist Arthur Berman as its expert. Berman intends to opine on the importance and value of seismic data, oil and industry standards of confidentiality, defendants' actions in light of those industry standards, MAR's measures to preserve the confidentiality of the seismic data, and MAR's damages from defendants' use of the proprietary information.

Berman also intends to opine that MAR suffered monetary damages, including the: 1) cost of acquisition of proprietary geological data, including seismic, drilling, and leasing information; 2) loss of prospective investments from Marksmen; and 3) loss of future profits.

Berman expects to base his testimony on: 1) MAR's records of its expenses to obtain the geological data ($2.9 million); 2) statements by Wayne Toole, the owner of MAR, about Marksmen's anticipated $800,000 investment; and 3) reports by two geological consulting firms, Ryder Scott Company and Billman Geologic Consultants, Inc., which, according to Berman

support an estimated loss of future profits of $1.9 million.

## Discussion

Federal Rule of Evidence 702 requires me to perform a "gatekeeping role" when considering the admissibility of expert testimony. *Daubert, supra,* 509 U.S. at 597, 113 S.Ct. 2786. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

■ Rule 702 applies not only to scientific testimony, but also to other types of expert testimony based on technical or other specialized knowledge. *See generally Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■ Under *Daubert,* I exercise a "gatekeeping" function, *supra,* 509 U.S. at 597, 113 S.Ct. 2786, consisting of three steps.

■ First, I must determine whether the witness is qualified as an expert. "When making a preliminary finding regarding an expert's qualifications under Fed.R.Evid. 104(a), the court is to examine 'not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Smelser v. Norfolk Southern Ry. Co.,* 105 F.3d 299, 303 (6th Cir.1997) (quoting *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir.1994)).

Second, I must determine whether the testimony is reliable. *See Daubert, supra,* 509 U.S. at 590, 113 S.Ct. 2786. The Court in *Daubert* listed several factors for consideration in assessing the reliability of scientific testimony, including:

- Whether a "theory or technique ... can be (and has been) tested";
- Whether it "has been subjected to peer review and publication";
- Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
- Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

*Kumho Tire, supra,* 526 U.S. at 149–150, 119 S.Ct. 1167 (quoting *Daubert, supra,* 509 U.S. at 592–594, 113 S.Ct. 2786).

■ The test of reliability is, however, "flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141, 119 S.Ct. 1167. "[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153, 119 S.Ct. 1167. The focus must be on the principles and methodologies on which the expert's opinion is based, and not on the merits of the expert's conclusions. *Daubert, supra,* 509 U.S. at 594–595 n. 12, 113 S.Ct. 2786; *U.S. v. Bonds,* 12 F.3d 540, 556 (6th Cir.1993) (district courts "are not to be concerned with the reliability of the conclusions generated by valid methods, principles and reasoning.").

■ Finally, I must determine whether the expert's reasoning or methodology properly applies to the facts at issue: *i.e.,* whether the opinion is relevant. *See Daubert, supra,* 509 U.S. at 591–593, 113 S.Ct.

2786. To be relevant, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. This relevance requirement ensures that there is a "fit" between the testimony and the issue to be resolved at trial. *Bonds, supra,* 12 F.3d at 555.

■ Rejection of expert testimony "is the exception, rather than the rule." *In re Scrap Metal Antitrust Litigation,* 527 F.3d 517, 530 (6th Cir.2008) (quoting Fed. R.Evid. 702 Advisory Committee's Note, 2000 Amend.). My role as gatekeeper "is not intended to serve as a replacement for the adversary system: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *U.S. v. 14.38 Acres of Land,* 80 F.3d 1074, 1078 (5th Cir.1996) (quoting *Daubert, supra,* 509 U.S. at 597, 113 S.Ct. 2786).

■ In assessing expert testimony, I "should also be mindful of other applicable rules." *Daubert, supra,* 509 U.S. at 595, 113 S.Ct. 2786. Federal Rule of Evidence 703 provides "[i]f the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *In re Paoli RR. Yard PCB Litig.,* 35 F.3d 717, 748 (3d Cir.1994) (*quoting In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1223, 1245 (E.D.N.Y.1985)).

The proponent of the evidence has to establish all the pertinent admissibility requirements by a preponderance of the evidence. Fed.R.Evid. 104(a); *see also Bourjaily v. U.S.,* 483 U.S. 171, 175–176, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

Defendants urge the court to exclude Berman's opinion. SEP argues that Berman is not qualified to offer his opinion on alleged damages of any kind, including the cost of acquisition of the seismic data, lost investment, and loss of future profits. Brock contends that Berman is not qualified to testify about any duty of confidentiality on Korpan's part, oil and gas industry confidentiality standards, and Brock's state of mind or credibility.

### A. SEP's Arguments

SEP raises two overarching issues. First, SEP contends that the TSA allows recovery for lost profits only, and not for either the cost of creating a trade secret or alleged loss of investment. Second, SEP argues that, in any event, Berman is not qualified to testify about any of MAR's alleged damages because he is an expert on geological matters only.

#### 1. Discussion of Damages

The TSA reads:

Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant in a civil action is entitled to recover damages for misappropriation. *Damages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.* In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty that is equitable under the circumstances considering the loss to the complainant, the benefit to the misappropriator, or both, for a misappropriator's unauthorized disclosure or use of a trade secret.

O.R.C. § 1333.63(A) (emphasis added).

■ Ohio law treats actual loss and unjust enrichment caused by misappropria-

tion as two distinct theories of recovery. Each requires plaintiff to prove with reasonable certainty that it suffered a loss because of defendant's misappropriation. *See Allied Erecting and Dismantling Co., Inc. v. Genesis Equipment & Manufacturing, Inc.,* 511 Fed.Appx. 398, 403 (6th Cir. 2013) (Unpublished disposition). As noted in *Avery Dennison Corp. v. Four Pillars Enter. Co.,* 45 Fed.Appx. 479, 485 (6th Cir.2002) (Unpublished disposition), however, "[d]amages in trade secrets cases are difficult to calculate because the offending company has mixed the profits and savings from increased quality and quantity of products, as well as savings from reduced research costs of research and production, with its own natural profits."

### a. Acquisition of Data

■ The *Avery* court held that when a defendant misappropriated a trade secret to field a competing product, plaintiff's lost profits or defendant's illicit gains are the "best measure of damages." *Id.* When defendant does not directly use the trade secret to field a competing product, however, plaintiff may use a variety of methods of calculation to determine damages. *Id.* Specifically, "where a trade secret has not been destroyed and where the plaintiff is unable to prove specific injury, courts measure the value of the secret to the defendant." *Id.* at 486. This may include "the value to the defendant of the secret at the time of misappropriation, the value derived from savings because of increased productivity, or the value derived from savings in research costs." *Id.*

■ Relying exclusively on *Avery,* MAR argues the cost of the creation of the trade secret, the seismic data, should be a measure of damages. In *Avery,* defendant used plaintiff's trade secrets to create a new line of products, making it difficult for plaintiff to prove specific injury. The de-

fendant's misappropriation of the plaintiff's trade secrets saved it both time and resources needed to create and manufacture their products. *Id.* The court in *Avery* held the district court did not abuse its discretion by allowing Avery's damages expert to present three theories of damages: reasonable royalty, defendant's profits, and defendant's avoided costs. *Id.* at 487.

This case is similar to *Avery.* MAR spent significant time and money on acquiring seismic data to help it identify oil and gas trends in Northwest Ohio. SEP allegedly used that data to lease lands along the oil and gas trends identified by MAR without incurring the same research costs. In its complaint, MAR states its specific injury as a result of the alleged misappropriation is difficult to ascertain.

I find it appropriate to use other methods of calculation to determine damages, including the value of the secret to SEP. Like the defendant in *Avery,* SEP may have saved both time and money by relying on MAR's existing data to identify oil and gas trends and lease lands.

Without ruling on the merits, I find the cost of the acquisition of the seismic data is an appropriate measure of damages because it may have had value to SEP. If nothing else, if SEP used MAR's seismic data improperly, what MAR spent and SEP thereby saved would appear to be a proper yardstick for a damage award.

### b. Lost investment

■ Berman intends to opine that the pending litigation between MAR and defendants made Marksmen, an energy company, withdraw its investment of $800,000 in MAR.

SEP contends Berman cannot know why Marksmen decided not to invest in MAR. Specifically, SEP notes that there is no evidence from Marksmen stating its deci-

sion not to invest.[1]  SEP also argues that there is no indication that MAR would have benefitted from Marksmen's investment.

MAR does not cite any cases indicating that a corporation can recover damages for the failure of a third party to invest in it.

I find SEP's argument persuasive. There must be a demonstrable link between misappropriation of the trade secret and MAR's loss. *See Allied, supra,* 511 Fed.Appx. at 403. Loss of investment, moreover, does not necessarily translate into lost income, much less lost profits. Berman even acknowledges the difficulty of quantifying net profit from this potential investment and that he is unable to do so. (Doc. 158–3 at 78:7).

▆▆ Under *Avery, supra,* 45 Fed. Appx. at 486, in situations where lost profits cannot be determined, the value of a trade secret to the defendant may be used as a measure of damages.  Here, however, MAR does not contend that SEP gained anything of value from the loss of investment by Marksmen, even if the pending litigation caused that loss.

I find that loss of investment is not an appropriate measure of damages and Berman cannot testify about it.

### c.  Loss of future profits

SEP does not dispute that loss of future profits is an available measure of damages under the TSA.

### 2.  Admissibility of Berman's Testimony

▆▆ SEP argues that as a geologist, Berman is not qualified to opine on damages.  SEP contends that Berman even objects to being called an expert on damages in his deposition.  MAR notes that

Berman has thirty-four years of experience in the oil and gas industry.  He worked for Amoco Production Company (Amoco) for twenty years and as an independent geological consultant for fourteen years.  At Amoco, Berman evaluated oil drilling prospects and oil reserves.

Berman is a licensed geoscientist in Texas.  He regularly calculates reserve forecasts for several oil companies.  He routinely evaluates acquisition and divestment opportunities in the petroleum industry.  He has extensively researched, published, and spoken on shale gas reserves, costs, and economics.  Berman has a masters of science degree in geology from Colorado School of Mines.  He has three awards from the Houston Geological Society.

I conclude Berman is qualified to testify about the general nature of oil and gas exploration, how such exploration has evolved, particularly with regard to the Northwest Ohio region, the use of seismic data and how geologists and prospectors acquire such data, the costs routinely associated with acquiring seismic data of the sort at issue here, the effect upon a company where a competitor misappropriates and uses the company's seismic data, the kind and type of benefits the competitor derives from using someone else's seismic data, and similar issues.

Berman cannot, however, give a definitive opinion about the damages which MAR actually suffered.  Putting a dollar figure in front of the jury on the basis of its own financial and other records is MAR's direct burden.  Berman's testimony can, however, assist the jury in assessing the reasonableness of MAR's expenditures for the data and the sort of benefits

---

1.  The only evidence is from the deposition of Wayne Toole in which he states a deal never went through with Marksmen because they changed management.  This does not corroborate Berman's opinion.

SEP would reasonably have derived from using MAR's data.

The foregoing subjects reflect Berman's experience in the industry and his expertise with oil and gas exploration. As he himself admitted, he's not an expert in damages. He is not an accountant or actuary. That does not mean that he cannot tell the jury about the nature of the overall damage—i.e., the injury—which SEP's misuse of MAR's efforts to develop its leases might have caused to it.

Part of that discussion can also include Berman's general observations about the effect on a company's attractiveness to prospective investors where such investors become aware of the sort of dispute at the heart of this case: namely, where one company is alleging that another took its seismic data and used it to pursue its own explorations within the same general geographic (or geological) area. But Berman cannot state that Marksmen would or would not have invested, or what would have happened had Marksmen invested. He has no expertise with such assessments.

More importantly, he has no personal knowledge about why Marksmen did not invest the $800,000 (or more) in MAR. Without such knowledge, Berman cannot testify as to a putative cause and effect relationship. Someone from Marksmen might be able to do so, but Berman cannot.

With regard to lost profits, Berman can tell the jury about the place of and role played in the oil and gas industry by a report which Ryder Scott Company published in 2010.[2] He can testify about what use people in the industry make of Ryder Scott reports, and the role such reports play in attempting to calculate the production and income to be gained from a particular area.

In essence, Berman can lay a foundation for the general trustworthiness of the Ryder Scott report.[3]

### B.  Brock's Arguments

Berman intends to opine that Brock knew, or should have known, that Korpan had misappropriated and was misusing MAR's trade secret in his dealings with Brock. In his opinion, Berman believes that Brock was willfully blind regarding Korpan's acquisition of the geological data. This alleged willful blindness breached the gas and oil industry standard of confidentiality.

Brock challenges Berman's expertise, arguing that Berman is not qualified to testify about the gas and oil industry standard of confidentiality nor any legal duty of confidentiality. Brock also argues that Berman intends to opine improperly on Brock's credibility and state of mind.

#### 1.  Industry Standards

■ Brock argues that Berman is not qualified to testify about oil and gas industry standards because he is not a landman

---

**2.**  Berman states that Ryder Scott has "a high reputation for doing quality analyses and they work for a lot of people in my industry." (Doc. 158-3 at 40/13–14).

  MAR also wants Berman to tell the jury about a 2003 report by Billman Geologic Consultants, Inc. Berman, however, has never heard about this company before this litigation. He know nothing about its qualifications. *Id.* at 39/13–19. The Billman report, moreover, was produced in 2003—two years before the GORA expired. That being so,

Berman cannot discuss the Billman report before the jury.

**3.**  It appears likely, though I make no definitive ruling the question, as the parties have not had an opportunity to address it, that, if Berman can lay a foundation for the Ryder Scott report, its estimate that MAR's future net income would be $1.9 million would be admissible under Fed.R.Evid. 803(17) (Market Reports).

and is not familiar with the standard practices of the industry in Ohio. Brock further contends that Berman's testimony about industry standards is too general and is not specific to Ohio.

Brock relies on *Preston v. All Vinyl Fences & Decks, Inc.,* 2008 WL 5428817 (Ohio Ct.App.2008), in arguing that an expert cannot opine on an industry standard based merely on the expert's own experience. In *Preston,* the court said that the experience of plaintiff's expert mattered little because he provided no evidence of an objective industry standard and had no experience in that particular county. *Id.,* *3. The court noted that in certain situations, experience alone can satisfy the evidentiary requirements of an expert. "Merely uttering the words 'standard in the industry,'" however, is not enough to qualify a witness as an expert. *Id.*

MAR argues that Berman's thirty-four years of experience in the industry, detailed above, qualifies him to opine on industry standards. In addition to Berman's work as a consultant for numerous companies located across the country, including Ohio, MAR notes that Berman regularly attends training courses regarding ethical duties in the industry.

MAR further argues that Berman's testimony is not too general because he relies on Codes of Ethics from both the American Association of Petroleum Geologists and the American Association of Petroleum Landmen. These codes establish nationwide industry standards on ethics, confidentiality, non-competition, and conflicts of interest.

I find MAR's argument persuasive.

Brock's reliance on *Preston* is misplaced. Berman does more than merely utter the words "standard in the industry." In addition to his thirty-four years of experience in the oil and gas industry, Berman bases his opinion on industry associations' codes of ethics and training courses on ethics. In this case, it does not matter if Berman has not worked in the county in question. Berman has presented evidence indicating that the standard of care is the same nationwide. A nationwide standard cannot be too general.

Finally, even though Berman is not a landman, there is no indication, and Brock does not argue, that the ethical standards of oil geologists differ from those of oil landmen.

I find that Berman's formal training and extensive experience in the industry qualify him as an expert witness to opine on industry customs, standards, and duties.

### 2. Duty of Confidentiality

Brock argues that Berman's report opines on a legal duty of confidentiality which is outside the scope of Berman's expertise. Brock contends that "[a]ny use of the term 'duty' or 'breach of duty' smacks of an opinion by the so-called expert of testimony concerning an alleged duty." (Doc. 169 at 9). Brock also argues that, in any event, Berman's testimony about a duty of confidentiality is not relevant because Brock did not disclose or use a trade secret.

In its brief, MAR states, "Berman does not intend to testify regarding any legal duties or the state of Defendant Brock's mind." (Doc. 166 at 2). MAR then says that Berman does intend to testify on oil industry customs, rules, and standards and whether Brock's actions were consistent with industry standards.

Brock seems to associate every use of the word "duty" with the legal element found in negligence cases. MAR, however, has no negligence claim and does not purport to raise one. Rather, Berman's testimony relates to obligations (in this case, not to disclose or use another's confi-

dential or proprietary information) arising from oil and gas industry standards. The law, while it may acknowledge the existence and legal effect of such obligation, does not create the obligation—as it does, for example, with the attorney-client, doctor-patient, marital, and cleric-penitent privileges. Berman recognizes this, stating, "It's never been part of my work history to give legal opinions." (Doc. 166 at 11).

While a breach of industry standard does not itself give rise to a legal cause of action, it is relevant to MAR's claims against Brock for misappropriation of trade secrets. Under O.R.C. § 1333.61(B)(2), misappropriation includes disclosure or use of a trade secret by a person who:

> knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

Berman's testimony is relevant because it will help the jury determine whether Brock knew or had reason to know that the seismic data he used was derived through Korpan's violation of the industry standard of confidentiality.

I find that it is appropriate for Berman to testify about the gas and oil industry's duty of confidentiality.

### 3. Mental State

Brock contends that Berman's expert report improperly opines on Brock's state of mind. Berman opines that Brock "knew, or had reason to know, that Mr. Korpan used MAR Oil's proprietary infor- mation in breach of a duty of confidentiality." (Doc. 165–1 at 12). Berman also states that "Mr. Brock's alleged willful blindness regarding Mr. Korpan's misappropriation of MAR Oil's information is, in itself, a violation of the industry standard." Id. at 22.

MAR contends that "Berman does not intend to testify regarding . . . the state of Defendant Brock's mind." (Doc. 166 at 2). Rather, MAR argues, Berman is merely opining whether Brock acted consistently with industry standards.

Under Federal Rule of Evidence 704, an expert witness may opine on ultimate issues to be decided by a jury. No expert, however, knows a party's state of mind. See, e.g., Johnson v. Baker, 2009 WL 3486000, *5 (W.D.Ky.2009) ("A party's state of mind, however, is not within the knowledge of any expert."); Woodhull v. County of Kent, 2006 WL 2228986, *6 (W.D.Mich.2006) ("Objective facts and circumstances may provide evidence of a defendant's state of mind, but conclusory statements . . . do not assist the trier of fact."). An expert, therefore, cannot opine on a party's state of mind. Berman's opinion that Brock knew Korpan used proprietary information is obviously an evaluation of Brock's state of mind. Unless Brock told Berman his state of mind, Berman cannot know Berman's mental state.

Berman may testify that Brock's actions are inconsistent with industry standards. Berman may even testify that a person with similar experience in Brock's position would have known the industry standard and acted accordingly. Berman cannot, however, make conclusory statements regarding Brock's actual state of mind.

### 4. Credibility

An expert cannot testify about a witness' credibility. The jury, not the expert, evaluates credibility. See, e.g.,

*Greenwell v. Boatwright,* 184 F.3d 492, 496 (6th Cir.1999) ("Regardless of the intent or motivation of the expert in commenting on the eyewitness testimony, we agree ... that the testimony regarding the credibility of eyewitness testimony was improper."); *Conde v. Velsicol Chemical Corp.,* 804 F.Supp. 972, 986 (S.D.Ohio 1992) ("It is the province of the jury to weigh the credibility of witnesses.").

MAR contends in its brief that Berman does not intend to testify about credibility. In his deposition, Berman reiterates this contention:

> Opposing Counsel: Did you view that it was part of your job as an expert witness to evaluate the credibility of the witnesses?
>
> Berman: No.
>
> Opposing Counsel: Did you actually make statements in your report concerning your evaluation of the credibility of the witnesses?
>
> Berman: I didn't make—I didn't make any specific reference to any of the witnesses, no.

(Doc. 169 at 2).

Berman's report, however, explicitly makes a credibility determination about Brock's testimony. Berman opines, "I do not find credible Mr. Brock's testimony of blind reliance on Mr. Korpan's experience in Ohio, while he also testified that he did not ask for any specifics of what Mr. Korpan's experience was." (Doc. 165–1 at 22).

As Brock argues, MAR and Berman say one thing but Berman's report says another. Berman's testimony must reflect his acknowledgment that commenting on credibility is improper and cannot come before the jury.

### Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT:

1. Defendant SEP's motion to exclude Arthur Berman's expert testimony be, and the same hereby is granted in part and denied in part as provided herein; and

2. Defendant Brock's motion to exclude Arthur Berman's testimony (Doc. 156) be, and the same hereby is granted in part and denied in part, as provided herein.

So ordered.